DONALD M. RUBIN *vs.* HOUSEHOLD COMMERCIAL FINANCIAL SERVICES, INC.

No. 98-P-342.

Hampden. October 7, 1999. - May 3, 2001.

Present: PORADA, DREBEN, & BECK, JJ.

*Contract,* Employment. *Employment,* Constructive discharge.

Discussion of Massachusetts and out-of-State cases considering the elements required for proof of constructive discharge. [439-445]

In an action by the chief executive officer of a corporation against the entity that had provided financing for the corporation, seeking damages for interference with contract and breach of fiduciary duty on the basis that the financing entity's actions had resulted in his constructive termination from employment, there was no error in the judge's ultimate finding that, because the situation in which the chief executive officer found himself was not so difficult that a reasonable person in his position would have found it to be intolerable, the corporation did not constructively discharge him. [446-448]

CIVIL ACTION commenced in the Superior Court Department on November 9, 1993.

The case was heard by *John F. Moriarty,* J.

*Bonita L. Stone (Kevin C. Maynard* with her) for the defendant.

*Charles V. Ryan* for the plaintiff.

BECK, J. On July 22, 1988, the plaintiff, Donald M. Rubin, became president and chief executive officer of National Felt Company, Inc. (National Felt), pursuant to a written five-year contract. Three years later, on August 16, 1991, he sent a letter to National Felt claiming that the company had constructively discharged him. Rubin also sent a letter that day to Eli S. Jacobs, chairman of the National Felt board of directors, and Karen Gordon Mills, a member of the board and close associate of Jacobs. The letter asserted that the recipients had "stripp[ed him] of [his] powers and responsibilities as President and Chief

Executive Officer of National Felt Company, Inc. . . . constitut-[ing] a constructive discharge . . . in direct violation of [his] rights and responsibilities as set forth in [the] employment contract." He characterized the actions of the individuals as "part of a classic freeze out maneuver . . . constitut[ing] a violation of the fiduciary duty [they owed to him] as a minority stockholder of [National Felt]." After sending the letters, Rubin cleaned out his desk, left his office, and never returned.

Rubin subsequently settled his claims against National Felt and the Jacobs parties. What remains is his complaint against Household Commercial Financial Services, Inc. (Household), the entity that financed Jacobs's purchase of the assets of the company which became National Felt. The complaint sought damages for interference with contract and breach of fiduciary duty. After a seven-day jury-waived trial, a Superior court judge ruled for the defendant Household on both counts. We affirm.

*Facts.* The particulars of the sale and subsequent operations of National Felt are set out in considerable detail in the Superior Court judge's findings and rulings. Our condensed version follows, "giv[ing] due weight to the findings of the [trial] judge which will be not be reversed unless clearly erroneous . . . ." *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 255 (1977). See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).

Rubin began working for the predecessor to National Felt in 1965. The original company was a Massachusetts corporation with its principal place of business in Easthampton, owned and operated by Israel Goldberg and his sons. It manufactured a variety of nonwoven synthetic and wool felt products, including cowboy hats and Mickey Mouse hats for Disney as well as novelty hats for many other customers. It was a successful enterprise. Beginning in 1970, Rubin was general manager of the nonwoven fabrics division. As the judge found and the plaintiff's brief acknowledges, "although [Rubin] developed considerable expertise in the production and marketing aspects of the company's business, he had no experience in financial matters," to the extent that he never saw a balance sheet or income statement for the division he headed. The Goldbergs had handled all the finances.

On July 22, 1988, the Goldbergs sold most of the company's

assets for $34,750,000 to an acquisition company controlled by the E.S. Jacobs Company. Eli S. Jacobs, the principal figure behind E.S. Jacobs Co., was an investment banker and entrepreneur who owned real estate and a number of businesses. Upon completion of the asset sale, he established National Felt as the new company.

The defendant Household financed a major part of Jacobs's purchase of the Goldbergs' company through various arrangements including a "revolving" loan, a "term" loan, and a "junior subordinated" loan, totaling $32 million. It also committed to provide National Felt with working capital up to $11 million. Household's total commitment at the outset was thus $43 million. The equity capital of the new company consisted of one million shares at two dollars per share, distributed as follows: Jacobs, sixty-two percent; Household, eighteen percent; Rubin, fifteen percent; and five percent divided among four other National Felt employees. The sum of these transactions was a highly leveraged buyout. The debt to equity ratio was more than twenty to one.

Two days before the closing, the three-member board of directors of the new company — Jacobs, Karen Gordon Mills (managing director of E.S. Jacobs Co.), and Roland Knight (another Jacobs employee) — met by telephone conference call. They elected Jacobs chairman of the board; Robert A. Crisafulli, "the financial man" for E.S. Jacobs Co., treasurer; Rubin, secretary; and Knight, assistant secretary.

As part of these transactions, Rubin negotiated a written employment contract. The terms of the agreement, as negotiated with Mills, called for Rubin to serve for five years as president and chief executive officer (CEO) "report[ing] only to the Board of Directors of [National Felt] . . . [and] vested with all powers incident or necessary to the office of Chief Executive, in accordance with policies established by, and subject to the authority of, the Board of Directors." Rubin's base salary was $200,000 per year, with an annual bonus, disability, medical, and life insurance, retirement benefits, four weeks paid vacation, a Cadillac automobile or the substantial equivalent, and reimbursement for all car related expenses. The agreement was subject to termination by reason of death, disability, or for cause.

In recognition of Rubin's lack of financial training and experience, Mills conducted a search for a chief financial officer (CFO) and recommended two candidates to Rubin. Rubin chose one of the candidates, who then in effect reported directly to the board of directors through Mills. As CEO, Rubin was in charge of all aspects of National Felt's activities except the financial area. The new company carried on essentially the same business as the old company. Rubin devoted his efforts to production and marketing.

National Felt did well in its first year of operation under Rubin's leadership. It had 4,000 products, purchased materials from 2,000 suppliers, and had 2,000 customers. In the spring of 1989, Rubin proposed to expand the synthetic nonwoven division's capacity by purchasing a nearby building and installing new, state of the art, computerized equipment. (The division had been operating at full capacity.) In June, 1989, Household agreed to increase the company's line of credit by the $8 million necessary to finance the expansion project.

In the fall of 1989, National Felt's situation began to deteriorate. A number of factors combined — the onset of the 1989 business recession, strong competition from Asia, the loss of the company's principal supplier, which went out of business, and increased costs of other supplies. The expansion project ran fifty per cent over budget because of increased costs of machinery and equipment and delay in completing the project. The company's net sales fell, as did its pre-tax income. In the winter of 1990 to 1991, it became apparent that Rubin needed some assistance to turn the company around.

By April, 1991, the company's cash flow was inadequate to meet the combination of its interest payments to Household and its operating expenses. It had already defaulted on a number of its contractual obligations to Household, and its line of credit was nearly exhausted. Mills had several discussions with Rubin about bringing in additional management personnel to help run the company.

In May, there were meetings and conversations between the Jacobs principals and Household. Rubin's future role in the company was among the subjects discussed. Mills and a business consultant whom Rubin had contacted at Mills's sugges-

tion thought Rubin was important, even "critical," to the company's recovery because of his knowledge of the manufacturing process and his relationships with the company's major customers. A Household participant thought he would have to be replaced or "moved upstairs" as chairman of the board with no responsibilities.

In late spring or early summer of 1991, Mills met with Rubin and introduced him to Peter Kurzina of Argus Management Company (Argus), a "crisis management" firm of "turnaround consultants." (Apparently the plaintiff disliked Kurzina almost from the beginning.) On July 11, 1991, the CFO of National Felt notified Household that the company would be unable to comply with a scheduled reduction on its revolving loan that the agreement, as amended, required. Household responded that it would not waive the default. As a result of Household's letter, Mills, acting on behalf of Jacobs, engaged Argus to take control of the financial and operating sides of National Felt as of July 25, 1991. By the end of the 1991 fiscal year, the company's liabilities exceeded its assets by $1.6 million. In their fiscal 1991 audited financial statement, the independent auditors expressed "substantial doubt about [National Felt's] ability to continue as a going concern."

On July 22, 1991 (three years to the day after the initial purchase), National Felt's treasurer and two representatives of Argus visited Rubin and told him that Argus would be taking over the following Thursday. They said they would be in town that day and asked him to introduce them to the key employees of the company at that time. After confirming that Mills had indeed engaged Argus, the plaintiff wrote a memorandum entitled "Priorities for Argus Management Corporation," which he faxed to Mills. Mills telephoned the plaintiff to make clear that Argus was not working for him and "that he would have to cooperate or there would be dire consequences."

Argus assumed management of National Felt on July 25 as planned. Thomas Brew, the Argus employee in charge, visited Rubin and told him they needed his help and asked for his cooperation. The judge found that "[t]he Argus team did not intend to relieve [Rubin] of his title or his job, and they needed his help in dealing with customers and in purchasing raw

materials." Moreover, Argus's role was to be temporary. Brew told Rubin they thought it would take more than a year to turn the company around, but that they did not anticipate taking over the company on a permanent basis, and hoped to return the business to its owners in a financially sound condition. Rubin introduced the Argus personnel to the National Felt employees as requested, "but he very much resented having been asked to do so."

One of the first actions Argus took was to discharge National Felt's CFO. Four days later, Kurzina sent a memorandum to a "distribution list" of the company's employees who had been authorized to make purchases on behalf of the company. The memorandum announced that nothing was to be purchased without Argus's approval. Rubin was not included on the distribution list but was designated to receive a copy. The judge found that the memorandum was not intended to apply to Rubin. In fact it was anticipated that, because of his knowledge of the fibers that were the raw materials for a large portion of the company's products, the purchase of such materials would continue to be under Rubin's control.

On July 31, Household notified E.S. Jacobs Co. through Mills that it was not willing to continue to fund National Felt's losses without an agreement to reorganize National Felt's capital structure. That letter drew an angry response from Mills. Brew, who had taken the title of CFO, then wrote a conciliatory letter to Household and gave Rubin a copy of Mills's letter as well as his own. Rubin was distressed when he discovered that he had not been informed of several prior letters or a meeting mentioned in the Mills and Brew letters. There followed a meeting in Chicago, the headquarters of Household, at which Mills introduced the Argus team to Household officials. Rubin was not invited. At this meeting, Argus expressed its intent to retain Rubin in his current position; Household seemed receptive. On his return, Brew gave Rubin a full report of the meeting.

Unhappy with the position in which he found himself, Rubin consulted a lawyer. After subsequently discussing his situation with Mills and another person at E.S. Jacobs Co., Rubin requested a buy-out of the two years remaining on his contract and a buy-back of his stock. (He had borrowed the $300,000 to

buy his 150,000 shares.) Mills rejected his proposal. In mid-August, Rubin lost his long-standing authority to give credits to customers who wanted to return merchandise. There followed the letters described in the first paragraph of this opinion and Rubin's departure from National Felt.

Throughout most of the events described above, Household had hoped to persuade Jacobs to make a new contribution of equity capital. Unsuccessful in these efforts, Household restructured National Felt's debt on its own. In the end, Argus was unable to turn the company around.

*Legal analysis.* The first count of Rubin's amended complaint claims that Household unlawfully induced National Felt to "break its contract with Rubin and to remove his authority as Chief Executive Officer . . . resulting in his constructive termination [from] his employment." His second count charges that Household "orchestrated the management changes which resulted in the divestiture from Rubin of the powers incident or necessary to the position of Chief Executive Officer. His constructive termination . . . resulted in the corporate 'freeze-out' of Rubin from his rightful position with [National Felt] in a breach of the fiduciary duty owed to Rubin by Household" as a fellow shareholder of National Felt.

The judge applied the doctrine of intentional interference with contract to the first claim. See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811 (1990), which established "improper motive" and "improper means" as alternative elements of the tort. Passing the question of whether the board of directors' engagement of Argus constituted a breach of its employment contract with Rubin, the judge found that there was no evidence of improper motive on the part of Household. He then considered whether the means Household used in inducing National Felt to employ a turnaround company constituted a breach of Household's fiduciary duty to Rubin. After a detailed analysis, which included the finding that Rubin "had effectively abdicated his authority over the financial aspects of the company's business to [the CFO and Mills]," the judge found no breach of fiduciary duty. Disposing of the second count of the complaint, the judge concluded that there was neither a breach of fiduciary duty nor a constructive discharge.

Rubin asserts in his brief that a finding that National Felt constructively discharged him is "vital" to both of his claims against Household. We agree. We therefore turn to an examination of the issue of constructive discharge.

*Constructive discharge.* In determining that there was no constructive discharge, the judge relied on *GTE Prods. Corp.* v. *Stewart*, 421 Mass. 22 (1995). He found that "[u]nder all the circumstances that existed in this case, the situation in which Rubin found himself when Argus took over was not so difficult that a reasonable person in his position would have found it to be intolerable. He was [therefore] not justified in quitting when he did."

In *GTE Products*, Stewart, the employee who claimed that he had been constructively discharged, was a lawyer serving at will as general counsel to GTE's lighting business. After he began urging company officials to take costly safety measures to protect consumers, his immediate supervisor suddenly lowered his "promotability rating" and communicated the company's dissatisfaction with Stewart's recent conduct. *Id.* at 25. Stewart asserted that the change in his standing at work constituted a constructive discharge in violation of public policy. The Supreme Judicial Court, observing that "[it had] not had occasion to address what an employee must prove to establish a constructive discharge . . . [turned to cases] decided by Federal and State appellate courts." *Id.* at 34.

The court defined constructive discharge as occurring when "the employer's conduct effectively forces an employee to resign," *ibid.*, quoting from *Turner* v. *Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244 (1994). "[T]he trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *GTE Prods. Corp.* v. *Stewart*, 421 Mass. at 34, quoting from the "frequently cited" decision in *Alicea Rosado* v. *Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). "The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable" (emphasis original). *GTE Prods. Corp.* v. *Stewart*, 421 Mass. at 34. "In order to amount to a

constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Id.* at 34-35, quoting from *Turner* v. *Anheuser-Busch, Inc.,* 7 Cal. 4th at 1247. Applying the test, the court decided Stewart was not constructively discharged.

Rubin claims that *GTE Products* is not on point because Stewart was an at will employee, whereas Rubin had a written contract. He relies instead on two earlier Massachusetts cases, *Miller* v. *Winshall,* 9 Mass. App. Ct. 312 (1980), and *Kravetz* v. *Merchants Distribs., Inc.,* 387 Mass. 457 (1982), both of which he brought to the judge's attention in his trial brief.

In *Miller* v. *Winshall,* Miller "was employed, pursuant to a written agreement, as president and chief executive officer of [a] corporation." 9 Mass. App. Ct. at 317. "[H]e was removed from this office at a board of directors meeting at which another person was elected president . . . [and] was offered 'continuing employment' in a subsidiary position at no change in salary . . . [whereupon he] resigned." *Ibid.* In affirming the master's "mixed fact and law general finding [that Miller was terminated]," *id.* at 317-318, we observed that "[i]f an employee, especially an executive employee, is engaged to fill a particular position, any material reduction in rank constitutes a breach of the employment agreement and is tantamount to discharge, unless the employment contract, by its terms, contemplates a change in the rank and nature of the job." *Id.* at 318 (citing *Steranko* v. *Inforex, Inc.,* 5 Mass. App. Ct. 253, 263 [1977] [applying New York law]; *Rudman* v. *Cowles Communications, Inc.,* 30 N.Y.2d 1, 10 [1972]; 4 Corbin, Contracts § 958 [1951]; and Annot., Reduction in Rank or Authority or Change of Duties as Breach of Employment Contract, 63 A.L.R.3d 539 [1975]). We concluded that Miller's discharge as president "accomplished effectively the termination of [his] employment by the [c]orporation." *Miller* v. *Winshall,* 9 Mass. App. Ct. at 318 (requiring that the corporation purchase Miller's shares at a considerably higher price than if Miller had not been terminated). The primary issue in *Miller,* however, concerned the defendant's complaints about the master's handling of the case.

In *Kravetz* v. *Merchants Distribs., Inc., supra,* Kravetz had sold his tire business to Merchants. The terms of the sale included a written contract governing Kravetz's employment as branch manager of his former store. After fifteen months, Merchants reassigned Kravetz to a lesser position overseeing the warehouse, with no change in pay or benefits. The court held that the jury would have been warranted in finding the reassignment to be a breach of contract, and consequently there was no error in the denial of Merchants' motion for a directed verdict, citing *Miller* v. *Winshall, supra.*

As the plaintiff's brief implicitly suggests, there appear to be two lines of cases concerning constructive termination — one that focuses on demotions and other loss of authority or status in executive and managerial positions, such as *Miller* and *Kravetz,* and another that focuses on claims of intolerable working conditions, such as the cases cited in *GTE Products.* In the case before us, the judge explicitly found that National Felt did not constructively discharge the plaintiff under the theory of *GTE Products.* This finding is not clearly erroneous. The question is whether *GTE Products* was the correct legal standard.

Curiously, we have found no opinions recognizing the separate lines of cases. At least one decision combines the standards, but without recognizing their separate origins. See *Mair* v. *Southern Minn. Bdcst. Co.,* 226 Minn. 137, 140 (1948), discussed *infra.* Some treatises have recognized separate theories. See Holloway & Leech, Employment Termination Rights & Remedies 79 (2d ed. 1993) (employee considered fired if he leaves job after employer "(1) [b]reaches the contract by reducing the employee in duties, rank, or compensation; or (2) [w]orking conditions are made so oppressive that resignation was the only reasonable alternative"); 2 Rothstein, Employment Law § 8.7, at 256 (2d ed. 1999) ("Most constructive discharges fall into one of two basic fact patterns. First, the employer can cause a constructive discharge by materially breaching the employee's contract of employment in some manner short of termination. Second, the employer can make working conditions so intolerable that the employee feels compelled to quit"). Cf. Baxter & Farrell, Constructive Discharge — When Quitting Means Getting Fired, 7 Employee Rel. L.J. 346, 352-357 (Winter 1981-1982).

The two theories reflect the different origins of the cases. The working conditions cases are the more recent. Constructive discharge as manifested in intolerable working conditions was first recognized in cases brought under the National Labor Relations Act. See *Goss* v. *Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984). In these cases, employers forced organizing employees to choose between their rights to organize and their jobs, or changed the working conditions after successful organization, forcing employees to quit. See *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 894 (1984), and cases cited; *School Comm. of Stoughton* v. *Labor Relations Commn.*, 4 Mass. App. Ct. 262, 270 (1976) (school employees constructively discharged where school committee revised program resulting in significantly reduced hours and salary after employees organized union). These cases have been extended to constructive discharge based on discrimination. See, e.g., *Goss* v. *Exxon Office Sys. Co.*, *supra* (sex discrimination); *Ramos* v. *Davis & Geck, Inc.*, 167 F.3d 727 (1st Cir. 1999) (age discrimination).

The demotion cases, including *Miller* v. *Winshall*, 9 Mass. App. Ct. at 317-318, rely on older and well established legal doctrine involving dismissal, discharge, and breach of contract under the general topic of master and servant relations (now labeled employment relationship, see 53 Am. Jur. 2d 48 [1996]). Given the limited case law in Massachusetts, a review of some of the leading cases from other jurisdictions is in order. Because the determination of constructive discharge depends in large measure on the particular facts of the case, see *Alicea Rosado* v. *Garcia Santiago*, 562 F.2d at 120; *Marks* v. *Cowdin*, 226 N.Y. 138, 147 (1919); Annot., Reduction in Rank or Authority or Change of Duties as Breach of Employment Contract, 63 A.L.R.3d 539, 544 (1975), we review the cases in some detail.

One of the earliest is *Marks* v. *Cowdin, supra.* In that case, there was evidence that the plaintiff was employed as a sales manager under a two-year written contract and, while the agreement was still in force, his employer "changed his powers and his duties . . . [and] told the plaintiff . . . that they were giving his position to another." Upon the plaintiff's refusal to go along with the change, his employer fired him. *Id.* at 146. In holding that a wrongful discharge claim was made out, the New York

Court of Appeals (in an opinion by Cardozo, J.) stated that the defendants "were free to change the plaintiff's duties at their pleasure as long as the position was unchanged in the things that determine its identity. Beyond that they could not go." *Ibid.*

Some years later, the Supreme Court of Minnesota decided the oft cited case of *Mair* v. *Southern Minn. Bdcst. Co.*, 226 Minn. 137 (1948). In that case, the plaintiff had a written contract for employment as the general manager of a radio broadcasting station. Dissatisfied with his performance, the board of directors ordered the plaintiff to appoint a particular person as assistant manager, "issue all orders through her . . . contract for no expenditures without her approval [and] . . . post notice of her appointment and authority as to execution of [these] orders on the bulletin board forthwith." *Id.* at 138. When the plaintiff "refused to continue with his work as long as the [directive] was in effect," the company discharged him. The plaintiff sued for salary due him for a period following his discharge. The question on appeal was whether the directive set out above was reasonable. *Id.* at 139. Quoting from 35 Am. Jur. Master & Servant § 35 (1941), the Minnesota Supreme Court related the rule as follows:

> "When an employee is engaged to fill a particular position in the service of his employer, any reduction of the rank or a material change in the duties of the employee is, in the absence of anything to justify the employer in so acting, a violation of the contract of employment and will form the basis of an action by the employee for damages for breach of contract."

*Mair* v. *Southern Minn. Bdcst. Co.*, 226 Minn. at 140. The court observed that "[t]aking away [the plaintiff's] authority to issue orders directly was certainly inconsistent with his contract." *Id.* at 139. (Section 35, quoted in part above, goes on to state the requirement that an employee show the new rank or duties were not within the contemplation of the contract.) "To the employees, to the public, and to the defendant itself, he would be manager in name only." *Id.* at 140. "[H]is authority and prestige were taken away from him." *Ibid.* Then, foreshadowing the later development of the intolerable working conditions cases, the court concluded, "[i]t is fair to assume that no one in

the position of plaintiff would have accepted the employment with such restrictions." *Ibid.* Thus, finding the order unreasonable, the court affirmed judgment for the plaintiff.

In *McLaughlin* v. *Union-Leader Corp.*, 99 N.H. 492 (1955), cert. denied, 353 U.S. 909 (1957), McLaughlin had a written contract to serve as a newspaper's advertising manager for five years. After two years, the newspaper placed McLaughlin indefinitely on leave with pay and appointed someone else to his job. The New Hampshire Supreme Court affirmed a jury verdict for the plaintiff, holding that "the defendant's right to assign the plaintiff's duties and responsibilities does not extend to the point where the assignment would constitute in effect a virtual replacement and demotion." *Id.* at 496, citing *Marks* v. *Cowdin, supra,* and *Mair* v. *Southern Minn. Bdcst. Co., supra.*

In *Rudman* v. *Cowles Communications, Inc.*, 30 N.Y.2d 1 (1972), which is cited in *Steranko* v. *Inforex*, 5 Mass. App. Ct. at 265, and *Miller* v. *Winshall*, 9 Mass. App. Ct. at 318, as well as many out-of-State cases, Rudman sold his successful test review business to Cowles Publishing. Rudman's business was to constitute a new subsidiary of Cowles with Rudman as vice president. His contract called for "such executive and administrative services in the educational publishing operations of [Cowles] or its wholly-owned subsidiaries as shall from time to time be reasonably assigned to him by the Company's Board of Directors and subject to the instructions, direction and control of senior executives of the Company." *Rudman* v. *Cowles Communications, Inc.*, 30 N.Y.2d at 6. In fact, Cowles gave the project they had assigned Rudman to other employees who were not senior executives, and required that Rudman "cooperate," even though his name had been removed as author of the line of test preparation books. Rudman was then largely ignored. He was moved into a new building where he had no subordinates, no editorial staff, and his work was under the supervision of others over whom he had no control. Relying on *Marks* v. *Cowdin, supra,* but not mentioning *Mair* v. *Southern Minn. Bdcst. Co., supra,* the New York Court of Appeals held that Rudman's action for wrongful discharge should be reinstated. The court wrote: "If an employee, *a fortiori an executive employee,* is engaged to fill a particular position, any material

change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement" (emphasis supplied). *Rudman* v. *Cowles Communications, Inc.*, 30 N.Y.2d at 10. This passage seems to be the first appearance of the emphasized phrase. It has been quoted or paraphrased in several subsequent constructive discharge cases, including two decisions of this court. See *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. at 263; *Miller* v. *Winshall*, 9 Mass. App. Ct. at 318. See also *Trapkus* v. *Edstrom's, Inc.*, 140 Ill. App. 3d 720, 725 (1986).

Later decisions applying this line of constructive discharge cases include the following. In *Hayes* v. *Resource Control, Inc.*, 170 Conn. 102 (1976), Hayes had a written contract to serve as vice president of sales and marketing. The contract expressly forbade demotion. The Connecticut Supreme Court held that the company's proposed reassignment of Hayes to be the sales manager of a nonexistent western sales district constituted a discharge. *Id.* at 105 ("Any unjustified reduction of the rank or a material change in the duties of an employee who is engaged to fill a particular position, not within the contemplation of the contract, constitutes a breach of contract," citing *Mair* v. *Southern Minn. Bdcst. Co.*, *supra*, and *Rudman* v. *Cowles Communications, Inc.*, *supra*). In order to escape such a finding, "the employer's direction must have been reasonable." *Ibid.* See *Brock* v. *Mutual Reports, Inc.*, 397 A.2d 149, 151 (D.C. App. 1979) (stating that material change in duties or significant reduction in rank will constitute constructive discharge if unjustified, but finding employer's action justified because employee incapable of serving in a managerial position); *Trapkus* v. *Edstrom's, Inc.*, 140 Ill. App. 3d at 725 (plaintiff who had oral contract to serve as vice president and executive employee of corporation lost all independent authority, was given menial tasks, and was locked out of corporate store, suffered a violation of employment contract in absence of justification); *Tracey* v. *Sconnix Bdcst. of S.C., Inc.*, 284 S.C. 379 (1985) (jury question whether demotion from position as sales manager for radio station to assistant sales manager constituted constructive termination; unjustified reduction in rank or material change of duties is a violation of contract and will support action for damages, citing *Brock* v. *Mutual Reports, Inc.*, *supra*, and 53 Am. Jur. 2d Master & Servant § 44 [1970]).

We conclude that Rubin is correct as to the appropriate legal analysis. It is the demotion line of constructive discharge cases that applies to the facts of his case. Applying these principles to the judge's findings of fact, which are not clearly erroneous, we conclude there was no error in the judge's ultimate finding that National Felt did not constructively discharge the plaintiff. See *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 210 n.6 (1993) (appellate court may "adopt different reasoning and affirm a judgment on grounds not specifically relied upon by the judge").

As at least one authority has noted, most cases finding that an executive has been constructively discharged involve express employment contracts, and a material breach not contemplated by the agreement that is so important it makes continued performance "virtually pointless." See 2 Rothstein, Employment Law § 8.7, at 257 (2d ed. 1999), quoting from *Gibson* v. *Cranston*, 37 F.3d 731, 737 (1st Cir. 1994) (applying Rhode Island law). Thus courts have found constructive discharge if the employer effectively gave the employee's job to someone else, see *Miller* v. *Winshall*, 9 Mass. App. Ct. at 317; *McLaughlin* v. *Union-Leader Corp.*, 99 N.H. at 496, transferred the employee's responsibilities leaving him without any authority, see *Trapkus* v. *Edstrom's, Inc.*, 140 Ill. App. 3d at 724; *Mair* v. *Southern Minn. Bdcst. Co.*, 226 Minn. at 140; *Marks* v. *Cowdin*, 226 N.Y. at 146; *Rudman* v. *Cowles Communications, Inc.*, 30 N.Y.2d at 12; or reassigned the employee to a nonexistent job. See *Hayes* v. *Resource Control, Inc.*, 170 Conn. at 104.

No similar circumstance is present here. Rubin kept his title, his office space, his salary, and his benefits. Argus valued his expertise in production and marketing and wanted his continued assistance in those areas. Brew testified that Argus intended Rubin to continue in his role as the CEO both inside and outside the company. While some of the plaintiff's authority was limited, he had from the beginning "effectively abdicated his authority over the financial aspects of [National Felt's] business." His contract provided that he have the powers necessary to the CEO, subject to the policies and authority of the board of directors. From the beginning the board placed responsibility for financial matters in the hands of the CFO,

who reported directly to them. Compare *Marks* v. *Cowdin, supra* at 141 (range of plaintiff's position sketched in outline in letters; picture completed when viewed against course of dealing); *Rudman* v. *Cowles Communications, Inc., supra* at 11 (broad language of contract ambiguous; court may and should look to prior negotiations to determine what was intended).

Moreover, here, Rubin was not a particular target of Household. Compare, in the working conditions line of cases, *Calhoun* v. *Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir. 1986) (purpose of constructive discharge doctrine is to protect employee from employer's effort to force resignation by imposing unreasonably harsh conditions in excess of those faced by co-workers); *Turner* v. *Anheuser-Busch, Inc.*, 7 Cal. 4th at 1247 (same). National Felt was in critical financial condition. Household had provided substantial financial backing which was at risk. Here the judge was "satisfied that Household fulfilled its obligation to protect Rubin's interests to the greatest extent possible in the light of the circumstances that existed at the time." The case law does not preclude reduction in rank or material change in duties that are "justified," see, e.g., *Brock* v. *Mutual Reports, Inc., supra*, or "reasonable," see, e.g., *Hayes* v. *Resource Control, Inc., supra*; *Mair* v. *Southern Minn. Bdcst. Co., supra*, although there is scant commentary describing what is justified or reasonable.

Finally, we note that the plaintiff left his job within a month of Argus's arrival. To the extent that a finding of constructive discharge suggests that there is no longer any possibility of rescuing the employment relationship, that point had not been reached here. As set forth in *GTE Prods. Co.* v. *Stewart*, "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast" (emphasis original). 421 Mass. at 36, quoting from *Garner* v. *Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Even an executive "is not . . . guaranteed a working environment free of stress." *Calhoun* v. *Acme Cleveland Corp.*, 798 F.2d at 561, quoting from *Bristow* v. *Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), cert. denied, 475 U.S. 1082 (1986). See *Turner* v. *Anheuser-Busch, Inc.*, 7 Cal. 4th at 1247. There

having been no constructive discharge, there is no basis for recovery from Household.

*Judgment affirmed.*