IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 6, 2003 Session

## JUDITH ANN WALKER v. CITY OF COOKEVILLE, TENNESSEE, D/B/A COOKEVILLE REGIONAL MEDICAL CENTER

Appeal from the Circuit Court  for Putnam County
No. 00N0158     John J. Maddux, Judge

No. M2002-01441-COA-R3-CV - Filed August 12, 2003

This appeal involves an employment dispute between the Cookeville Regional Medical Center and a senior management employee.  After the hospital's chief executive officer removed the employee from her position as Interim Assistant Administrator and Director of Quality Management, the employee resigned and filed suit in the Circuit Court for Putnam County alleging that the hospital breached her employment contract by declining to pay her the severance benefits required by her employment contract.  Following a bench trial, the court found that the hospital had breached the employment contract and awarded the employee severance benefits, prejudgment interest, and discretionary costs.  The hospital argues on this appeal that the employee was not entitled to severance pay because (1) she had voluntarily resigned, (2) the parties understood that the employee's appointment as assistant administrator was not permanent, and (3) the employee's demotion did not materially alter her duties or status.  We affirm the judgment because the hospital breached the employee's contract when it demoted her and declined to pay her the severance benefits required by her employment contract.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

H. Rowan Leathers III, Nashville, Tennessee, for the appellant, City of Cookeville, Tennessee d/b/a Cookeville Regional Medical Center.

Phillip P. Welty, Nashville, Tennessee, and Ronald Thurman, Cookeville, Tennessee, for the appellee, Judith Ann Walker.

### OPINION

### I.

Judith Ann Walker, a registered nurse with a bachelor's and a master's degree,  was hired by the Cookeville Regional Medical Center ("hospital") in June 1994 as the Director of Quality Management.  She was an at-will employee and was not a member of senior management.  As Director of Quality Management, Ms. Walker was responsible solely for managing the Quality

Management Department which provided support to the medical staff regarding credentialing, staff committees, and peer review and coordinated the hospital's quality management training and programs.

In 1998, the hospital was in turmoil because of the departure of its chief executive officer ("CEO") and the dispute between the hospital's board of trustees and the city council regarding the council's desire to sell the hospital. Eventually, William Jennings, the hospital's chief operating officer ("COO"), was named interim chief executive officer with the understanding that he would not be considered for the permanent CEO position. With a new administration on the horizon, Mr. Jennings set out to keep a core group of the hospital's managers intact by offering them the financial security that comes with an employment contract. Ms. Walker was one of these managers.

On March 17, 1998, Ms. Walker and the hospital entered into a contract naming her the hospital's "Interim Assistant Administrator and Director of Quality Management." Section 5 of the contract provided that

> [t]he term of this Agreement shall be for one (1) year commencing on the date of the execution of this Agreement. Upon the expiration of this initial term, this Agreement shall continue for additional terms of one (1) year each year upon the same terms and conditions herein provided, unless either party gives written notice to the other party at least sixty (60) days prior to the expiration of the then current term of its or her election to terminate the Agreement at the expiration of the then current term. If such notice is given, this Agreement shall terminate at the expiration of the then current term.

Accordingly, either the hospital or Ms. Walker could elect to terminate the agreement by giving the other party at least sixty days notice prior to the expiration of the current term. If no notice was given, then the contract would be renewed for another year at the expiration of that term.

In addition, Section 6.1(h) of the contract contained the following provision regarding severance pay:

> Hospital may also terminate this Agreement "without cause" at any time upon thirty (30) days prior written notice to Walker. Provided, however, that in the event of Walker's termination "without cause" Hospital shall be obligated to pay to Walker, as severance pay, an amount equal to the aggregate compensation and all benefits due Walker for the balance of the current term of this Agreement, or one (1) year, whichever is longer.

The agreement also provided that Ms. Walker could terminate the agreement "without cause" at any time upon thirty days prior written notice, "but no severance pay or benefits shall be paid to her."

Ms. Walker's duties and status at the hospital changed significantly after she became the Interim Assistant Administrator and Director of Quality Management. Prior to the contract, she

supervised only the Quality Management Department. After the contract, she became responsible for additional departments, including the hospital resources library, education, oncology services, infection control, and environmental services. She answered directly to the interim CEO and was responsible for working with the directors of the departments under her supervision with regard to budget matters and problem solving issues. In addition, her requisition authority was increased from $250 to $1,000, and she became part of the small group of senior managers who met periodically to discuss hospital policy and to make management and policy decisions for the hospital.

In February 1998, the hospital hired Tod Lambert as its new permanent CEO, and Mr. Jennings temporarily returned to his COO position awaiting the hiring of his successor. Mr. Lambert hired a financial consultant and a nursing consultant to review the hospital's operations and began making personnel changes at the senior management level. At least two other assistant administrators – Ms. Walker's peers – stepped down and were given their contractual severance benefits under Section 6.1(h). Because the hospital did not give Ms. Walker the required notice of its intent not to renew her contract as Interim Assistant Administrator and Director of Quality Management, her employment contract was automatically renewed on March 17, 1999 for another year.

In April 1999, Mr. Lambert hired Bernard Mattingly as the hospital's new COO. Shortly thereafter, the hospital published a new organizational chart that still recognized Ms. Walker's status and position as Interim Assistant Administrator. Even though she now reported to Mr. Mattingly rather than Mr. Lambert, Ms. Walker was still a member of the senior management team[1] and remained responsible for the management and control of the departments placed under her supervision.

Later in the year, Messrs. Lambert and Mattingly decided to combine the corporate compliance, internal audit, and quality management programs under a new Assistant Administrator of Quality and Compliance. They recruited and hired a new employee for this position, and in late September 1999, Mr. Lambert met with Ms. Walker to tell her that the hospital had created a new position of Assistant Administrator of Quality and Compliance and that her current position of Interim Assistant Administrator and Director of Quality Management would be abolished.[2] He also informed her that he intended to "demote" her to Director of Quality Management and that she would answer to the new Assistant Administrator of Quality and Compliance. As a result of this demotion, Ms. Walker would no longer be part of the hospital's senior management team and would again become an employee at will. Mr. Lambert also told Ms. Walker that her salary would not be reduced but that she had "topped out" as far as the salary for the Director of Quality Management position was concerned.

Mr. Lambert advised Ms. Walker to be a "team player" and told her that he expected her to teach the new Assistant Administrator of Quality and Compliance everything she knew. He also told her that "being demoted wasn't so bad because he himself had been demoted, and that the people

---

[1] By this time, the senior management team consisted of Mr. Lambert, Mr. Mattingly, the chief financial officer, the director of human resources, and the two remaining assistant administrators – one of which was Ms. Walker.

[2] The hospital's lawyer and the Director of Human Resources were present at this meeting.

at the hospital were too caught up in titles." The meeting ended when Ms. Walker stated that she desired time to think about her circumstances and to talk with her lawyer.

The hospital proposed that Ms. Walker take a brief administrative leave to consider Mr. Lambert's proposal. After several days of leave, Mr. Lambert asked Ms. Walker for her decision. She informed him that she did not desire to be moved back to the Director of Quality Management position and that she desired to invoke the severance rights under her contract. Mr. Lambert responded by suggesting that Ms. Walker hire a lawyer and resolve the matter with the hospital's Director of Human Resources. Ms. Walker also informed Mr. Lambert that she was prepared to work out her thirty days notice or leave immediately whichever he preferred. Ms. Walker had no other conversations with Mr. Lambert. At some point during the process, the hospital offered her $39,000 to resolve the remaining issues regarding her termination of employment. Ms. Walker did not accept the offer and left her employment at the hospital with no severance benefits of any sort.

On May 5, 2000, Ms. Walker filed suit against the City of Cookeville in the Circuit Court for Putnam County, alleging that the hospital had breached her employment contract by refusing to pay her severance benefits under Section 6.1(h) of her employment contract after terminating her job as "Interim Assistant Administrator and Director of Quality Management" without cause. The trial court handed down its ruling at the conclusion of the April 23, 2002 bench trial. In a May 17, 2002 order reflecting its ruling, the trial court concluded that the hospital's proposed demotion of Ms. Walker amounted to a constructive discharge because it materially and substantially changed her contractual duties and management status at the hospital. The trial court also determined that the hospital had breached Section 6.1(h) of Ms. Walker's contract and awarded her $90,707 in severance pay and $23,000 in prejudgment interest. On May 21, 2002, the trial court entered another order awarding Ms. Walker $1,802.15 in discretionary costs. The hospital has perfected this appeal solely to challenge the trial court's conclusion that it breached Ms. Walker's contract by refusing to pay her severance benefits in accordance with Section 6.1(h) of her contract.

## II.
### THE STANDARDS OF REVIEW

This appeal involves a bench trial that focused on the construction of a written employment contract and the conduct of the parties to the contract and their representatives. Accordingly, it requires the use of two familiar standards of review. The first is the standard in Tenn. R. App. P. 13(d) governing the review of the factual findings of a trial court sitting without a jury. This standard requires the reviewing courts to presume that the trial court's factual findings are correct unless the evidence preponderates against them. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). It also requires the reviewing courts to defer to factual findings predicated on the trial court's assessment of the credibility of the witnesses. *Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d 164, 167 (Tenn. 2002); *Parks Props. v. Maury County*, 70 S.W.3d 735, 741 (Tenn. Ct. App. 2001).

However, Tenn. R. App. P. 13(d) does not compel appellate courts to defer to the trial court's decisions on questions of law. A trial court's resolution of legal questions is not entitled to a presumption of correctness, *King v. Pope*, 91 S.W.3d 314, 318 (Tenn. 2002); *Parks Props. v. Maury County*, 70 S.W.3d at 742, and reviewing courts will reach their own independent conclusions regarding legal questions. *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998);

*Placencia v. Placencia*, 48 S.W.3d 732, 734 (Tenn. Ct. App. 2000). Questions regarding the interpretation or construction of a written contract are just such legal questions. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983); *General Constr. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 520 (Tenn. Ct. App. 2002); *Atkins v. Atkins*, 105 S.W.3d 591, 594 (Tenn. Ct. App. 2002).

Courts construe contracts solely to ascertain and to give effect to the contracting parties' intentions. *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). When the parties have reduced their contract to writing, these intentions should be contained in the four corners of the contract, *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 135 (Tenn. 2001); *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998), and the contracting parties' rights and obligations should be governed by their written contract. *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn. Ct. App. 1999). Thus, in the absence of fraud or mistake, the courts should construe unambiguous written contracts as they find them. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002); *Willis & Willis, L.P. v. Gill*, 54 S.W.3d 283, 286 (Tenn. Ct. App. 2001).

The courts' initial task is to determine whether the written contract is ambiguous. If the contract's language is plain and complete, the contracting parties' intentions must be gathered from the language of the contract alone. The rules of contract construction come into play only when the court determines that the contract is ambiguous or incomplete. *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). Contractual ambiguity arises only when contractual provisions may reasonably be read to have more than one meaning. *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001); *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 643 (Tenn. Ct. App. 2000). It does not arise simply because the contracting parties interpret their contract differently. *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001); *Simonton v. Huff*, 60 S.W.3d 820, 825 n.3 (Tenn. Ct. App. 2000).

Contract provisions should be considered in the context of the entire contract. *D & E Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518 (Tenn. 2001); *Pitt v. Tyree Org. Ltd.*, 90 S.W.3d 244, 253 (Tenn. Ct. App. 2002); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999). In addition, the language used in a contract should be given its natural and ordinary meaning. *Planters Gin Co. v. Federal Compress & Warehouse, Inc.*, 78 S.W.3d at 889-90; *Evco Corp. v. Ross*, 528 S.W.2d 20, 23 (Tenn. 1975); *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d at 681. The courts should avoid strained constructions of contractual language that create ambiguities where none, in fact, exist. *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975); *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn. 1973).

The courts should avoid rewriting contracts for parties who have spoken for themselves and should avoid relieving parties from their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 223; *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d at 682. In addition, the courts should maintain neutrality between the parties unless they determine that a particular contractual provision is ambiguous. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d at 598; *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814, 821 (Tenn. Ct. App. 1990). However, if the court

determines that a contractual provision is ambiguous, it should construe the provision against the party responsible for drafting it. *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 153-54, 425 S.W.2d 590, 592-93 (1968); *Marshall v. Jackson & Jones Oils., Inc.*, 20 S.W.3d at 682.

### III.
### MS. WALKER'S MARCH 17, 1998 EMPLOYMENT CONTRACT

The hospital insists that Mr. Lambert did not breach Ms. Walker's employment contract in September 1999 when he informed her that he had demoted her from Interim Assistant Administrator and Director of Quality Management to Director of Quality Management. Pointing to the fact that Ms. Walker's job title contained the word "interim," the hospital argues that Ms. Walker's appointment as an assistant administrator was never intended to be permanent and, therefore, that it had the contractual leeway to remove her as an assistant administrator at any time. This argument ignores the contract's distinction between not renewing Ms. Walker's contract and terminating her without cause.

Ms. Walker's March 17, 1998 employment contract is not ambiguous. Under the contract, she became the hospital's Interim Assistant Administrator and Director of Quality Management with all the duties and status attendant to that position.[3] The term of the contract was for one year, and Section 5 of the contract provided for the automatic renewal of the contract for a one-year period on its annual anniversary date unless one of the parties notified the other sixty days before the contract's expiration of its desire to terminate the contract.

In addition to Section 5 governing the termination of Ms. Walker's contract at the end of its term, her March 17, 1998 contract contained provisions governing the termination of her contract at other times. Section 6.1 permitted the hospital to terminate the contract any time "for cause" or "without cause." Section 6.1(h) provided that the hospital may terminate Ms. Walker's contract without cause by giving her thirty days written notice. In the event of a termination without cause under Section 6.1(h), the hospital became contractually obligated to pay Ms. Walker "as severance pay, an amount equal to the aggregate compensation and all benefits due Walker for the balance of the current term of this Agreement, or one (1) year, whichever is longer." Section 6.2 permits Ms. Walker to terminate her contract "without cause" upon giving thirty days written notice and provides that Ms. Walker is not entitled to severance pay if she does so.

We do not disagree that the use of the term "interim" in the job title of Ms. Walker's employment contract signals an understanding that her employment as assistant administrator was not intended to be permanent. We could easily draw the same conclusion from the facts that the initial term of her contract was for only one year and that the hospital was actively recruiting a new CEO when Ms. Walker's contract was signed. However, the fact that her appointment as assistant administrator was not long-term did not give the hospital a license to ignore the termination provisions of her signed contract whenever it decided to remove her from that position. Thus, if the

---

[3]The contract did not spell out all of Ms. Walker's duties in detail, but it referenced her "current job description" and recited that she was obligated to "perform all duties that may be required of her by virtue of her position." The hospital did not introduce Ms. Walker's job description, and there is no evidence in this record that she was not effectively performing all the duties required of her.

hospital desired to remove Ms. Walker as Interim Assistant Administrator and Director of Quality Management, it was required to follow the procedures in either Section 5 or Section 6 of her contract.

The hospital's argument blurs the distinction between a Section 5 and Section 6.1(h) termination of Ms. Walker's contract. A Section 5 termination does not trigger the contract's severance pay provision. A Section 6.1(h) termination does. Had the hospital notified Ms. Walker sixty days in advance of March 17, 1999 that it did not intend to renew her contract, Ms. Walker would have no contractual claim for severance pay under Section 6.1(h). Accordingly, the threshold question for us to decide is whether the hospital undertook to terminate Ms. Walker's contract under Section 5 or Section 6.1(h). The evidence is overwhelming that the hospital did not attempt to terminate Ms. Walker's employment contract pursuant to Section 5. Because the hospital has never asserted that it terminated Ms. Walker for cause, Section 6.1(h) is the only termination provision relevant to this dispute.

## IV.
### THE HOSPITAL'S CONSTRUCTIVE DISCHARGE OF MS. WALKER AS INTERIM ASSISTANT ADMINISTRATOR AND DIRECTOR OF QUALITY MANAGEMENT

The hospital seeks to circumvent its obligation to pay severance benefits under Section 6.1(h) by arguing that it did not terminate Ms. Walker. It asserts that Ms. Walker voluntarily terminated her contract under Section 6.2 and, therefore, that she is not entitled to severance benefits under Section 6.1(h). We disagree. Like the trial court, we find that Ms. Walker did not terminate her contract and employment "without cause." Rather, we find that the hospital constructively discharged Ms. Walker. She resigned only after the hospital terminated her contract without cause by demoting her from Interim Assistant Administrator and Director of Quality Management to Director of Quality Management.

Terminating an employee triggers potentially significant legal consequences for an employer. Accordingly, employers may, on occasion, attempt an "end run" around these consequences by engaging in conduct calculated to induce an employee to quit. *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1025 (Cal. 1994), *criticized on other grounds*, *Romano v. Rockwell Int'l, Inc.*, 926 P.2d 1114, 1125 (Cal. 1996); *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000). The doctrine of constructive discharge recognizes that some resignations are coerced and that employers should not be permitted to escape liability simply because they forced an employee to resign. *Smith v. Brown-Forman Distillers Corp.*, 241 Cal. Rptr. 916, 920 (Ct. App. 1987); *Stronzinsky v. School Dist. of Brown Deer*, 614 N.W.2d 443, 461 (Wis. 2000); WILLIAM J. HOLLOWAY & MICHAEL J. LEECH, EMPLOYMENT TERMINATION: RIGHTS AND REMEDIES 142 (2d ed. 1993) ("HOLLOWAY & LEECH"); LEX K. LARSON, UNJUST DISMISSAL § 6.06[2] (1999). The doctrine disregards form and recognizes that some resignations, in substance, are actually terminations. *Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1201 (Md. App. 1984).

Courts today recognize two varieties of constructive dismissal. HOLLOWAY & LEECH, at 79; 2 MARK A. ROTHSTEIN, EMPLOYMENT LAW § 8.7, at 256 (2d ed 1999); Ralph H. Baxter, Jr. & John M. Farrell, *Constructive Discharge – When Quitting Means Getting Fired*, 7 Employee Rel. L.J. 346, 352-57 (1981). The first, and currently most frequently encountered, variety appears in the context

of hostile work environment discrimination claims. In these cases, a constructive discharge arises when an employer permits a hostile working environment to render an employee's working conditions so intolerable that resignation is the employee's only reasonable alternative. *E.g.*, *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 34-35 (Tenn. 1996). This case does not involve that variety of constructive discharge.

The second variety of constructive discharge, and the one implicated in this case, involves the demotion of executive employees who have a position-specific contract. Professor Corbin points out that an employment contract may involve a position of dignity and privilege and that these contracts are breached when an employer reduces an employee to an inferior status. He observes that

> [o]ne who has been hired to be superintendent or general sales manager would generally be justified in quitting if he [or she] is ordered to act as floorwalker or sales clerk, even though the salary is not reduced. Such an order would also frequently be held to be a wrongful discharge by the employer.

8 CATHERINE M.A. MCCAULIFF, CORBIN ON CONTRACTS § 34.10, at 256 (Joseph M. Perillo ed., rev. ed. 1999). Accordingly, when an employee with a position-specific employment contract resigns after the employer forces the employee to choose among demotion, termination, or resignation, the employer remains liable for breach of contract unless the facts clearly demonstrate a fairly bargained for release of the employer. *Kass v. Brown Boveri Corp.*, 488 A.2d 242, 245 (N.J. Super. Ct. App. Div. 1985).[4]

Tennessee courts have recognized this principle in two unreported cases. In the first case, a Texas insurance company removed seventy-five percent of the duties of the executive vice president of a Tennessee insurance company it had acquired. The executive vice president's employment contract was not only position-specific, but it also provided for the continuation of the employee's duties. After the employee filed suit for breach of contract, the Texas company argued

---

[4]Other courts have reached similar results in cases where an employee resigns instead of accepting an offer of a lesser position. *Breen v. Central Iowa Power & Light Co.*, 224 N.W. 562, 564 (Iowa 1929) (whether an employee was discharged or resigned is immaterial when an employer's attempts to alter the employee's job status to a markedly different position provides a basis for the employee to consider that his employment contract has been breached); *Miller v. Winshall*, 400 N.E.2d 1306, 1310 (Mass. App. Ct. 1980) (if an executive employee is employed to fill a particular position, any material reduction in rank constitutes a breach of the employment agreement and is tantamount to a discharge); *Howard v. Conlin Furniture No. 2, Inc.*, 901 P.2d 116, 119-20 (Mont. 1995) (an employee terminated from his managerial position was "discharged" and his subsequent refusal to accept an offer of a lesser position, at best, affected his duty to mitigate damages); *Sanders v. May Broadcasting Co.*, 336 N.W.2d 92, 95-96 (Neb. 1983) (a constructive discharge and breach of contract occurs when an employee contracts to fill a particular position and subsequently unjustifiably suffers a material change in duties or significant reduction in rank); *Hondares v. TSS-Seedman's Stores, Inc.*, 543 N.Y.S.2d 442, 444 (App. Div. 1989) (any material change in duties or significant reduction of rank of an employee under contract to fill a particular position may be treated by the employee as a breach of contract); *Kloss v. Honeywell, Inc.*, 890 P.2d 480, 485-86 (Wash. Ct. App. 1995) (an employer breached a contract to employ an employee as an industrial nurse by offering the employee a maintenance position). *But see Rubin v. Household Commercial Fin. Servs.*, 746 N.E.2d 1018, 1028 (Mass. App. Ct. 2001) (the lender who took over a business did not constructively discharge the president and CEO even though it limited some of his powers when it allowed him to keep his title, his office, his salary, and his benefits).

that it had not demoted the employee because it had "retained him in the same titular position." This court held:

> Contrary to the insistence of defendant, such reduction in authority and responsibility did constitute a violation of the contract for which defendant was responsible in damages. Superficially, it may be argued that an employee whose titular position and salary are continued has no basis for complaint as to reduction in work load. However, to those highly skilled and motivated employees who have deep pride in their accomplishments and responsibilities, salary is not the only remuneration for employment. To such employees, the loss of responsibility or authority is equal to or worse than loss of pay.

*Smith v. American Gen. Corp.*, No. 87-79-II, 1987 WL 15144, at *5 (Tenn. Ct. App. Aug. 5, 1987), *perm. app. denied* (Tenn. Nov. 23, 1987).

The second case involved an employer's abolition of a "Special Assistant to the President" position as part of a reorganization. The incumbent in the position, who had a written, five-year employment contract, was reassigned to a production job, purportedly five levels below his former position. The employer later offered the employee a severance package if he would leave "quietly" and then terminated him for cause when he would not resign. The employee filed suit for breach of contract. Reversing a summary judgment for the employer, this court noted:

> The reassignment of plaintiff to a job "five levels" lower than the job for which he was hired without more, would constitute a breach of the employment contract. Plaintiff was hired for a specific position of Special Assistant to the President, and his duties were described in the employment agreement as being comparable to that of senior management. While his salary remained the same, his duties were significantly diminished with his reassignment to a production job, and it has been held that such a demotion can be characterized as a discharge of the employee.

*Phillips v. Morrill Elec., Inc.*, No. 03A01-9901-CH-00030, 1999 WL 771511, at *3 (Tenn. Ct. App. Sept. 15, 1999) (No Tenn. R. App. P. 11 application filed).

The largely undisputed evidence in this case clearly supports the trial court's conclusion that the hospital constructively discharged Ms. Walker. Her employment contract was position-specific and was for a definite term. Following her contract's automatic renewal in March 1999, Ms. Walker was the hospital's Interim Assistant Administrator and Director of Quality Management for a one-year term ending in March 2000. Her duties, responsibilities, and rank as Interim Assistant Administrator were significantly broader than her former duties as Director of Quality Management.

In September 1999, the hospital decided to demote Ms. Walker to Director of Quality Management, to reclassify her former position, and to hire someone to replace her. The hospital, at least initially, offered Ms. Walker no severance benefits. Thus, she had the choice of either

-9-

accepting the demotion or resigning. When she requested severance benefits under Section 6.1(h), the hospital offered to pay her the salary she would have earned for the remainder of her contract rather than to pay her the severance benefits under Section 6.1(h) of her employment contract.

We do not question Mr. Lambert's authority to reorganize the hospital's management team. However, he was required to undertake the reorganization in light of the employment contracts of the affected management employees. He could have shuffled his management personnel without exposing the hospital to paying severance benefits by timing the changes to coincide with the termination of the affected employees' contracts in accordance with Section 5. For some reason not apparent in the record, Mr. Lambert decided that he could not wait until March 2000 to fully implement the reorganization.

Under the facts of this case, Mr. Lambert constructively discharged Ms. Walker as Interim Assistant Administrator and Director of Quality Management when he demoted her during the term of her written contract. Not only were Ms. Walker's duties and rank significantly diminished, but Mr. Lambert hired her replacement and instructed Ms. Walker to teach her everything she knew.[5] In addition, he breached Ms. Walker's employment contract when he declined to pay her the severance benefits provided in Section 6.1(h). Accordingly, the record supports the trial court's conclusion that Ms. Walker did not terminate her contract "without cause" when she resigned rather than being demoted and that the hospital became liable to Ms. Walker for severance benefits under Section 6.1(h) of her contract when Mr. Lambert removed her from her Interim Assistant Administrator and Director of Quality Management while her written employment contract was still in effect.

## V.

We affirm the judgment and remand the case for whatever further proceedings may be required. We tax the costs of this appeal to Cookeville Regional Medical Center and its surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[5]Giving an employee's job to someone else amounts to a constructive discharge. *See Miller v. Winshall*, 400 N.E.2d at 1310.