# United States Court of Appeals
## For the First Circuit

No. 03-1319

SERGE TRIGANO,

Plaintiff, Appellant,

v.

BAIN & CO., INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Oberdorfer,[*] Senior District Judge.

Max Folkenflik, Folkenflik & McGerity, with whom Karen D. Hurvitz and Carl D. Stursberg, Stursberg & Veith, were on brief, for appellant.
Joseph L. Kociubes, Bingham McCutchen LLP, with whom Mark W. Batten, Bingham McCutchen LLP, was on brief, for appellee.

August 17, 2004

---

[*]Of the District of Columbia, sitting by designation.

**OBERDORFER, <u>Senior District Judge</u>**.  Serge Trigano was the President and Chief Executive Officer of the Paris-based international resort and travel giant Club Méditerranée, S.A. (better known as "Club Med").  In October 1996, Trigano issued a warning that Club Med's profits for the fiscal year ending that month would be significantly below market expectations.  When the company's financial results became available--which was not until February 1997, due to systemic delays--profits below what Trigano warned of, combined with significant restructuring charges, produced a loss of 740,000,000 French francs (over $100 million).  That same month, Trigano resigned.  Shortly thereafter, he sued Bain & Co., Inc. ("Bain"), the United States-based owner of a French management consulting company[1] Club Med hired to perform a strategic audit in the wake of the October profit warning.

The complaint alleged a variety of theories arising out of what Trigano termed a "boardroom coup" that forced him to resign.  In essence, it alleged that Bain conspired with Club Med's largest shareholder to produce a fraudulent and misleading report

---

[1]     Bain et Compagnie S.N.C., or "Bain France."  The U.S. parent--the only defendant named here--claims that it was not directly involved in any of the allegedly tortious activity.  Bain further argues that Trigano should be judicially estopped from holding it responsible for the acts of Bain France since Trigano kept this case in the United States in the face of a <u>forum non conveniens</u> motion only by insisting that the U.S. parent had participated directly in the challenged conduct.  Because we resolve this case on other grounds, we need not reach this issue.  We therefore can--and, for the sake of simplicity, do--use "Bain" to refer without distinction to both parent and subsidiary.

critical of Trigano. An alleged co-conspirator then secretly and improperly sent that report to a key Club Med shareholder. The report, says Trigano, cost him the support of that key shareholder. Trigano claims that this loss of support--and his reasonable expectation that others would follow that shareholder's lead--caused him to resign.

The district court granted Bain's motion for judgment as a matter of law at the close of Trigano's case. Trigano appeals. Concluding that Trigano did not present enough evidence for a reasonable trier of fact to find that Bain's alleged conduct was the "cause" of Trigano's losing his job, we affirm.

I

We begin with a de novo examination of the record evidence, focusing on the key issue of causation.

Club Med's 12-member Board of Directors was composed primarily of representatives of its major shareholders, many of which had longstanding relationships with Club Med. In 1996 and 1997, when the events at issue unfolded, Club Med's two largest shareholders--Exor, S.A. ("Exor") and Caisse des Depots et Consignations ("CDC")--had each invested over $100 million in Club Med and collectively owned over 23% of Club Med stock. Each had two Directors on the Board. Six other major shareholders held one seat each. The remaining two Directors were Trigano and his father, Gilbert Trigano, neither of whom owned shares in the

company at that time.  Gilbert Trigano had been with Club Med since shortly after its founding and was Chief Executive Officer and Chairman of the Board until he resigned in 1993.  His son, the plaintiff here, then assumed those positions, having worked with Club Med in various capacities for nearly three decades.

In October 1996, the price of Club Med's stock dropped precipitously--17% in a single day--after Trigano warned that Club Med's profits for that fiscal year would be between 100 and 150 million French francs, well below analysts' expectations.  Those expectations were fueled in part by what Trigano described as misinterpretations of financial forecasts he had made the previous month.  (Trigano acknowledged that he knew his remarks had been misunderstood, but decided not to issue a public correction at the time.)  In response to the profit warning, an Exor representative on the Club Med Board of Directors--Tiberto Ruy Brandolini d'Adda ("Brandolini")--suggested Club Med hire a management consultant to review the company's strategy.

Club Med solicited and received four bids, including one from Bain.  Trigano, for Club Med, chose Bain, in part because Brandolini recommended Bain, which had done an earlier analysis of Club Med for Exor.  On January 8, 1997, Bain signed an agreement with Club Med to perform a strategic audit of the company (the "Strategic Audit").  The Bain partner responsible for the Strategic Audit was Jean Marie Péan.  Trigano created a Steering Committee

headed by Antoine Cachin, Club Med's Executive Vice President, to oversee the study. A subcommittee--consisting of Péan, Cachin, an Exor representative (Pascal Lebard), and an internal Club Med auditor--served as the "Working Group" of the Steering Committee.

Throughout this time--both before and after Club Med retained Bain--Péan met with various Exor executives to discuss, among other things, the Strategic Audit. Neither Péan nor Exor disclosed these meetings to Trigano or Cachin, or indeed to anyone at Club Med. Trigano theorizes that these meetings evidence a conspiracy between Bain and Exor, pursuant to which Bain helped Exor engineer Trigano's ouster. Bain received substantial increased business (and income) from clients affiliated with Exor after Trigano resigned, thus, Trigano claims, demonstrating Bain's incentive and reward for participating in the conspiracy.

In February 1997, Club Med's accountants and auditors completed their accounting for fiscal 1996, which had ended on October 31. They advised Trigano of the financial results: a loss of 740,000,000 French francs (over $100 million), including significant restructuring charges and operating profits below those Trigano had predicted in October. Before announcing these results publicly, Trigano communicated directly or "through channels" to individual directors the amount of the loss and his explanation of it. Many of them were surprised and disappointed by these results. On February 6, 1997, the audit committee of the Board met to review

the financial results; Trigano was "uncomfortable" with the committee members' lack of responsiveness and participation at the meeting and conceded that the meeting "didn't seem right."

On February 7, 1997, Club Med directors representing Exor (Gianluigi Gabetti) and CDC (Phillippe Lagayette) called Trigano to a meeting in Paris. Their summons was so insistent that Trigano canceled a planned trip to the United States. At the meeting, Gabetti and Lagayette told Trigano that they were "very unhappy" with his performance and had decided to "get rid of [him] and to fire [him]." These directors proposed that Trigano relinquish control over day-to-day operations and become chair of a newly created "supervisory board." When Trigano rejected this offer, Gabetti and Lagayette told him to "take a week" to consider things and then they would meet again.

Trigano then contacted the remaining directors to find out whether they would continue to support him. He assumed Exor and CDC were making similar contacts to consolidate support for their position. Trigano or his father received assurances of support from each of the six remaining directors over the next week. Nippon Life Insurance Company ("Nippon Life") was a major Club Med shareholder and its Chairman, Josei Itoh, a Club Med director. On February 13, 1997, Trigano flew to Tokyo to meet with Itoh, who expressed his "full support" for Trigano and promised to send him a proxy for the upcoming Board meeting if he needed it.

Around this time, on February 14, at the direction of Exor, Péan produced the report that Trigano alleges to have been misleading and fraudulent (the "February 14 report"). Péan delivered that report to Exor on February 15, but--at Exor's direction--did not provide it to Cachin or Trigano. The February 14 report did not recommend replacing Trigano or making any other personnel changes, but Trigano argues that its emphasis on management problems gave the inaccurate impression that Péan (and thus Bain) believed Trigano should be terminated. This impression allegedly reflected Exor's critical stance toward Club Med management rather than Péan's own views. In fact, Péan believed at that time, as he testified on cross-examination, that Club Med's management problems could best be resolved by "hir[ing] a Chief Operating Officer to assist Trigano as Chief Executive Officer." The February 14 report did not include any such recommendation.

The February 14 report was not marked as a draft, though it was the first iteration of what became Bain's initial report to Club Med. Although Club Med had directed Bain to focus initially on strategic rather than organizational issues, the February 14 report included significant criticism of Club Med's organizational structures. In a section titled "Organizational failings," the February 14 report identified, inter alia, the following problems: the "new worldwide organization that has been set up is not working and was not correctly thought out"; the "unsuitability of the

current organization is clear," including "total confusion" about the respective roles of the head office and operational management; "lack of efficient management systems"; and "lack of skills in many areas." Trigano characterized the language and tone of the February 14 report as strikingly harsh and negative.

Péan spent the weekend of February 15 and 16 revising the February 14 report. He presented a revised version, dated February 17, to Club Med management as his initial draft. This new report toned down some of the harsher language and criticisms and included more positive information. Among other things, the later version changed the heading "Organizational failings" to "Strengths and weaknesses of Club Méditerranée." As revised, the report said that the "new worldwide organization" was "colliding with market realities of [customer] flow and competition," rather than that it was "not working" and "not correctly thought out." The "lack of skills in many areas" became a "need to reinforce skills in many areas," while "lack of efficient management systems" became "non-efficient management systems," and the "confusion" between the roles of head office and operational management was no longer "total." Trigano points to these revisions to show that the February 14 report over-emphasized the negative in ways that did not reflect Péan's true views and, in this sense, was misleading and fraudulent.

The February 17 draft underwent further revisions, with input from Cachin, who signed off on behalf of Club Med on a final report dated February 19, 1997 (the "February 19 report" or "final report"). The final report included many of the criticisms in the February 14 report as well as some new ones, including:

> The primary weakness of [Club Med] is a number of organizational failings that have bogged down its ability to produce an acceptable and predictable level of profit over the past few years. This weakness--a marked one in an increasingly competitive environment--has a potential to continue to produce the same effects [i]f organizational changes are not implemented rapidly in the three following areas: management systems, skills, and structure.

Nonetheless, Trigano does not allege that the February 19 report was fraudulent or misleading, and he testified that this final report did not contain the material that harmed him.

While Péan was revising and finalizing the Bain report, he learned that Exor had circulated the February 14 report to others. Péan did not mention to Cachin or Trigano the existence of the February 14 report or its circulation to some members of the Club Med Board of Directors.

On February 17, 1997, Trigano again met with Gabetti and Lagayette of Exor and CDC. They again asked Trigano to resign. They suggested that there might be a way for Trigano to retain a modified version of his position while ceding authority over day-to-day operations. Trigano again refused to resign, and told them

-9-

that he had the "support of a big part of the Board, including Nippon Life" and felt he had more than enough votes to defeat any attempt to force his resignation.

On the morning of February 18, 1997, a CDC employee telephoned Nippon Life analyst Veronique Trançon in Paris and told her that she would shortly receive a "strictly confidential" Bain report which was being distributed to Club Med board members but was to be kept secret from Club Med management. When Trançon then received the February 14 report, she translated what she saw as key excerpts from the French of the original into English and prepared a summary of it. Trançon's superior in the Paris office, Toshiya Nakamura, then prepared a Japanese summary from the English translation and summary. Both the English and Japanese documents were then sent to the Tokyo office (where it was already evening). Trançon then translated the rest of the report into English, which Nakamura translated into Japanese, with both versions again sent to Tokyo. Trançon also provided her own opinions and recommendations of what should be done in light of the report, which were also translated into Japanese, with both versions again sent to Tokyo. None of Nippon Life's translations, summaries or analyses of the report--in either English or Japanese--were introduced at trial.

The "chain of communication" from Paris to Tokyo went from Trançon to Nakamura, then to the "staff" of a Mr. Nahara in Tokyo, then to Nahara himself. Trançon testified that, of these

employees, only Nahara communicated directly with Chairman Itoh. Communications between Paris and Japan were primarily in Japanese, which Trançon did not speak; Itoh spoke neither French nor English. Only Itoh had the authority to decide whether Nippon Life would provide a proxy for the Club Med Board meeting.

Trançon characterized the tone of the report as "very violent" and "very hostile." None of the problems the report identified were news to Trançon, and she was aware of actions Club Med management was taking to address all those problems. The report did not convince her that Trigano should be replaced, and she did not recommend supporting his ouster. Trançon testified that, later on February 18, after sending materials to Tokyo, Nakamura told her, in effect, that "as a result of the report, no proxy" would be forthcoming.

Trigano understood, as of February 18, that he had lost the support of Nippon Life.[2] Also on February 18, the

_____

[2] Bain takes the position that Trigano did not learn that the Nippon Life proxy would not be forthcoming until February 20-- two days _after_ he decided to resign. Bain introduced an affidavit in which Trigano swore that "On February 20 Nippon Life told me they could not provide me with a proxy . . . ." We cannot find this as a fact. For purposes of this appeal, we must view the evidence in the light most favorable to Trigano, that is, that he thought he had lost Nippon Life's support as of February 18.

Trigano was not allowed to testify, on hearsay grounds, how he came to this understanding, but proffered evidence that he learned this from Cachin, who had allegedly been told by a Mr. Uno, who Trigano described as a sometime "liaison" between Club Med and Nippon Life. While what Trigano heard from Cachin is admissible as to Trigano's state of mind, it is not admissible as evidence of the truth of the underlying statements about Nippon Life's intentions.

representative of another Club Med director, American Express, called Trigano to suggest he accept the Exor/CDC proposal, describing it as fair and sensible. Trigano was "shocked" by this in light of the expression of support he had gotten from American Express the previous week. Trigano did not ask--then or later--the basis for this change of heart. Nor did he contact any of the other Board members (including Nippon Life) to ask whether he still had their support or to lobby for their support. Instead, Trigano decided it was "better to resign" at that point. According to Trigano, the loss of Nippon Life's proxy was critical to his decision because Itoh was a very powerful member of the Board and could be expected to influence other shareholders. Trigano testified that "by losing the support of [Itoh] the battle was over, I had to resign."

Trigano informed Exor and CDC on February 18 that he would resign as Chief Executive Officer. That same day, Trigano was told that Philipe Bourguignon, then head of Euro Disney, would replace him. Trigano then negotiated the terms of his resignation and signed a letter of resignation on February 20. Trigano officially announced his resignation to the Board of Directors on February 21, 1997 and nominated Bourguignon as the new Chief Executive Officer. At that time, none of the directors objected, asked any questions, or otherwise expressed support for Trigano or concern about his replacement. Trigano became chair of Club Med's

newly formed supervisory board, a position from which he resigned in July 1997, after deciding that Bourguignon was not allowing him to play the substantive role he had expected.

Trigano negotiated severance payments from Club Med and its American subsidiary totaling over $4.8 million.  As part of the settlement agreement with Club Med, Trigano "declare[d] that all his rights have been addressed in full [and] renounce[d] any future action of any type relative to the execution of the termination of his contract."

## II

The district court, along with the jury, heard six and a half days of testimony, the majority from Trigano and Péan.  At the end of Trigano's case in chief, Bain moved for judgment as a matter of law.[3]  The district court granted judgment on the following grounds: (1) Trigano failed to offer any evidence of conspiracy as promised in his opening statement; (2) Trigano did not "offer sufficient proof to reach the jury on the critical element of proximate cause"; (3) Trigano was estopped from asserting any claim based on the alleged negligence of Péan and Bain France; (4) Bain owed no duty to Trigano individually as distinguished from Bain's

---

[3]     The district judge granted the motion on the record after oral argument.  In doing so, he stated that his decision was "based in essence on the arguments made in the defendant's motion and the supporting briefs.  In other words, I adopt them."  He did not issue a separate decision.

-13-

corporate client, Club Med; and (5) the "economic loss rule preclude[d] any recovery on Trigano's negligence claims."

The district court's analysis of the causation issue focused on the lack of evidence that the February 14 report had any impact on the Club Med directors. Trigano and his father, who held two of the twelve seats, were presumably not influenced by it. The four directors representing the two largest stockholders sought Trigano's removal before the February 14 report. There was no evidence that five of the other six directors ever received, much less saw or were influenced by, the February 14 report.

As to Nippon Chairman Itoh, the district court carefully traced the French February 14 report into the labyrinth which served him and found no evidence that it penetrated to the Chairman. The principal witness to the movement of the report could "not testify from her own knowledge that Itoh or anyone else in Japan even read the report, much less what, if any, effect it had on Itoh's thinking." A reasonable jury could not find that the February 14 report was "decisive for Itoh" because Trigano proffered no evidence that the report was more likely to have influenced Itoh's decision than other key factors, notably including the "disastrous financial results for 1996 and Trigano's inability to predict them."

The foregoing considered, the district court concluded that Trigano's proof of causation utterly failed.

-14-

III

"We review the grant of judgment as a matter of law <u>de novo</u>." <u>Cruz-Vargas</u> v. <u>R.J. Reynolds Tobacco Co.</u>, 348 F.3d 271, 275 (1st Cir. 2003). We view the evidence in the light most favorable to the party against whom judgment was granted. We may affirm only if we "find that, as a matter of law, the record would permit a reasonable jury to reach only one conclusion." <u>Katz</u> v. <u>City Metal Co.</u>, 87 F.3d 26, 28 (1st Cir. 1996). A party "may not rely on conjecture or speculation" to show that an issue should have gone to the jury, but must present evidence that "make[s] the existence of the fact to be inferred more probable than its nonexistence." <u>Resare</u> v. <u>Raytheon Co.</u>, 981 F.2d 32, 34 (1st Cir. 1992) (internal quotation marks and citations omitted). "[A] mere scintilla of evidence is not enough to forestall a directed verdict, especially on a claim or issue as to which the burden of proof belongs to the objecting party." <u>Fashion House</u>, 892 F.2d at 1088.

IV

The principal issue on appeal is causation. Trigano correctly points out that Bain uses the term "proximate cause" improperly since the issue Bain raises is one of causation simpliciter. The dispositive question is whether the February 14

report was the cause of Trigano's job loss at all, not whether it was so remote a cause that Bain should not be held responsible.[4]

Bain argues that Trigano did not introduce evidence sufficient to persuade a reasonable jury that Bain's allegedly tortious conduct caused him injury, and that none of Trigano's theories of recovery can survive this basic failure of proof. Trigano's theory of causation is that the February 14 report caused him to lose the support of a key member of the Board of Directors, without whose support he knew he could not maintain his position, thus forcing him to resign to avoid dismissal.

This theory piles speculation upon speculation. Trigano's argument that the February 14 report is the only plausible explanation for Nippon Life's withdrawal of support discounts, without justification, his own actions. The fact is that Trigano predicted profits of 100-150 million French francs for fiscal 1996 in October, then had to advise the Club Med directors in February 1997 that the audited loss for the year would be 740 million francs. In addition, among the gaps in the causal chain on which Trigano relies:

_____

[4] For this reason, we need not reach the question Trigano raises as to whether French or Massachusetts law should apply here. The only conflict Trigano identifies between French law and Massachusetts law is that the former requires "causation alone" while the latter requires proximate cause for negligence claims. Because our holding that Trigano did not submit sufficient evidence of "causation alone" is equally dispositive under French or Massachusetts law, there is no relevant conflict to resolve.

- There Is No Evidence that the February 14 Report Had Any Effect on 11 of the 12 Directors.  Of the 12 members of the Board of Directors, two votes (those of Trigano and his father) were presumably "sure votes" for Trigano regardless of the report.  Four votes (those of Exor and CDC) were demonstrably against Trigano well before the report was written and regardless of what it said.  As to the other six Club Med Directors, there is no evidence that any of them, or any company they represented other than Nippon Life, ever saw the February 14 report.

- There Is No Admissible Evidence from Which a Reasonable Jury Could Conclude that the February 14 Report Caused Nippon Life to Withhold Its Proxy.  The only person at Nippon Life with authority to decide whether to provide a proxy to support Trigano was Chairman Itoh.  There was no evidence at trial that Itoh ever saw the February 14 report or any summary of it, much less saw it before Trigano decided to resign on February 18, nor that Itoh changed his mind about providing the proxy because of it.

  Trigano purports to rely on Trançon's testimony about the February 14 report to show that the report influenced Nippon Life's decision, but her testimony is not competent for this purpose.

-17-

Trançon's testimony that her supervisor, Nakamura, told her the proxy would not be issued "as a result of the report" is not evidence that <u>Itoh</u> decided not to issue the proxy based on the February 14 report. First, the chain of communication through which Trançon said information flowed from Tokyo--from Itoh to Nahara, from Nahara to his staff, from Nahara's staff to Nakamura, and from Nakamura to Trançon herself--demonstrates just how many levels of hearsay preclude admitting Trançon's report of Nakamura's statement for this purpose.[5] Second, the statement as quoted by Trançon does not even purport to be about Itoh's decision, as opposed to Nakamura's opinion (or, for that matter, his prediction of what would happen) or that of his contacts in Tokyo.

Moreover, the language barriers that required the French original to be translated first into English and then into Japanese create further difficulties. Neither

---

[5]  Trigano argues that Bain failed to preserve its objection to this testimony and thereby waived its right to challenge the use of this testimony for any purpose whatsoever. In fact, Bain <u>did</u> ask the district court to note its objection to this testimony (which was given in response to a question from the court, even though the court had previously upheld Bain's objections to similar questions from Trigano). Trigano's claim that Bain's failure to appeal this evidentiary decision waives this argument is mistaken. A prevailing party may urge affirmance of a district court decision on any ground, and no cross-appeal is required to defend a judgment by challenging an underlying evidentiary ruling. <u>See</u>, <u>e.g.</u>, <u>Olsen v. Correiro</u>, 189 F.3d 52, 58 n.3 (1st Cir. 1999).

Trançon's English translations or summaries nor Nakamura's Japanese versions were introduced into evidence, making it impossible for Trigano to show whether, or the extent to which, they preserved the aspects of the original draft he perceived to be tortious. Contrary to Trigano's argument, this problem is not solved--indeed, it may be exacerbated--by the fact that Trançon sent her own "impressions and conclusions" as to the report's negative tone to Tokyo. The question is not whether Trançon's characterization of the report injured Trigano, but whether the report itself did.

Trigano next argues that the timing of Nippon Life's change of heart, coupled with the lack of evidence as to other possible causes for it, is enough to allow an inference in his favor. In support of this, he claims "it became clear Nippon Life would not send the proxy" on February 18, "within a few hours" of the report being sent to Tokyo. However, there is no evidence that Itoh's decision not to issue the proxy was made at that time, rather than earlier or later. Trançon's testimony is no more competent to show the timing of Itoh's decision than to show his motivation.[6] Nor can Trigano's own testimony

_____

[6] Bain goes too far when it argues that there was no competent evidence that Nippon Life _ever_ withdrew its support. There was admissible evidence that Itoh promised Trigano a proxy,

-19-

about when he learned that he would not be receiving the proxy supply the missing information; that testimony was admissible only as to Trigano's state of mind and not for the truth of the underlying statements.

Although Trigano faults Bain for not providing some alternate explanation for Itoh's reversal, it is not Bain's burden to do so. Moreover, Trigano overlooks evidence weighing against his argument that the report is the only plausible explanation for a director withdrawing its support at that time. Contrary to Trigano's claim, the fact that Itoh promised Trigano his proxy after Trigano revealed Club Med's loss for fiscal 1996 does not mean that the extent of that loss--or Trigano's failure to predict it--did not influence his ultimate decision not to provide a proxy. Indeed, a representative of American Express--which also initially supported Trigano after hearing those financial results--called Trigano to withdraw its support on February 18. Yet there is no evidence that American Express even received the February 14 report, undermining any inference that no other factors were at work. Trigano himself testified that he

and that no proxy was provided before the Board meeting. This alone allows an inference that, at some point, Nippon Life decided not to send the promised proxy. It does not, however, demonstrate when or why Nippon Life made this decision.

-20-

understood Exor and CDC were lobbying the other directors to support his ouster during this time.

- <u>There Is No Evidence that the Allegedly Fraudulent or Tortious Aspects of the February 14 Report Were Relevant to Nippon Life's Decision</u>. Since Trigano characterizes the February 14 report as misleading and negative in a way the February 19 report was not, Bain argues that Trigano must show that the February 14 report affected Itoh in a way the revised report would not have. While Bain may go too far in suggesting Trigano must "prove" this counter-factual, the underlying point is valid: Trigano has the burden of proving that Nippon Life's decision was based on the aspects of the February 14 draft that he contends were fraudulent. Trigano's concession that the February 19 report was not tortious, and that its distribution would not have cost him his job, constrains this showing. The relevant inquiry is not an objective one about the impact of the differences on some hypothetical reasonable director, but the subjective one of whether the differences between the reports would affect their impact <u>on Itoh</u>. Indeed, it is difficult to see how Trigano could show that the complained-of aspects of the February 14 draft played the

-21-

causal role in Itoh's decision without any testimony from the decision-maker himself.

Bain emphasizes that Trigano neither deposed nor called as a witness Itoh or any other decision-makers or members of the Board of Directors, even though he was expressly authorized to depose these individuals and had argued in response to forum non conveniens motions that he could depose them more easily if the case remained in the United States. While Trigano responds that it is improper to consider the evidence that was not presented rather than the evidence that was presented, he misses the point. It is not that such evidence would have made his case stronger, but that there are aspects of his case that cannot be proven without evidence that could be provided only by the Board members or decision-makers.

Trigano attempts to dodge this problem by arguing that the February 14 report should not be compared to the revised report, but to Péan's real belief that Trigano should not be replaced.[7] This argument fails. While Péan presumably had a duty not to include false or

_____

[7]    Trigano claims in his Reply Brief that his references to the February 19 report in his Complaint as the "'true' report" were made before discovery. This is of no significance, however, particularly since Trigano re-affirmed his characterization of the February 19 report as accurate in his trial testimony.

fraudulent claims in his report, he was under no obligation to include an affirmative recommendation that Trigano should keep his job. Moreover, even if Péan had included such a statement, there is no evidence that this would have had any impact on Itoh's decision.

- Trigano's Claim that He Was "Forced" To Resign Is Too Speculative To Support a Jury Verdict. Trigano claims he decided to resign once he heard he had lost Nippon Life's support because he considered Itoh so influential that he anticipated losing the support of other Board members without his support. Trigano's speculation about what other Board members might have done is not evidence. There is no evidence that Nippon Life's views actually influenced any other Board members as to this--or, indeed, any other--issue. When Trigano decided to resign on February 18, neither he nor his father contacted Itoh (or anyone else at Nippon Life) to ask the reason for this change of heart or to respond to whatever concerns might have prompted it. Nor did Trigano or his father contact any other Board member who had previously supported him to see if there was a way Trigano could maintain his position. Even if Trigano could show that Nippon Life's decision was caused by the February 14

draft, there is no evidence this decision effectively caused Trigano to lose his position.

Trigano argues that his resignation, even if voluntary, does not break the chain of causation because the jury could find that "the end and aim of the conspiracy was to cause that resignation." In the total context of this case, this argument is without merit. Trigano cannot hold Bain responsible for the loss of his job if he could have kept that job had he not resigned.

Trigano argues that his resignation should not be considered voluntary because it was the product of the defendant's deceit, and thus that it does not break the chain of causation. An apparently voluntary resignation, however, does not rise to the level of constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances. See, e.g., GTE Prods. Corp. v. Stewart, 421 Mass. 22, 33-35 (1995) (rejecting claim that employee who resigned was constructively discharged based on his unreasonable assumption that he would be dismissed). The cases Trigano cites are not to the contrary. As the Supreme Judicial Court of Massachusetts well put it long ago, a plaintiff cannot recover where damages associated with his fraudulently obtained resignation were "due to the

exercise of his own judgment rather than the deceit of the defendants inducing him to resign as manager." Lowrie v. Castle, 225 Mass. 37, 48 (1916).

Regardless of whether any of these gaps in Trigano's proof would alone have been sufficient to justify taking this case from the jury, when we consider them collectively, we are convinced that no jury could reasonably have found that Trigano had proven that Bain's conduct caused his injury. Because we affirm on this ground, we do not reach the other grounds the district court gave for its decision.

V

Trigano also challenges a number of the district court's evidentiary rulings.

He objects first to the exclusion of evidence of Bain's dealings with Exor and Exor's alleged threat to sue Trigano if he sued Bain. We need not reach this issue; this evidence goes only to the existence of a conspiracy and is not relevant to the dispositive causation issue.

Trigano next challenges the exclusion of a two-page letter to him from Cachin, dated February 28, 1997, which discussed the preparation and distribution of various drafts of the Bain reports. Although Trigano objects to the court's characterization of the letter as hearsay, he does not explain how its exclusion harmed his case in any way. The letter does not include any

significant information that was not introduced at trial through other means. There is nothing in it that could change our analysis of the issue of causation. If the trial judge erred, it was harmless.

Trigano also complains that the district court wrongly excluded evidence going to his state of mind, including what he was told about Nippon Life's proxy that led him to resign. While evidence of what Trigano was told is indeed admissible as to his state of mind, the district court ultimately allowed Trigano to testify that, and explain why, learning that Nippon Life had withdrawn its support led him to resign. Because the excluded evidence would be cumulative for the claimed purpose, no harm was done to Trigano by refusing to admit it.

Finally, Trigano objects to the exclusion of testimony from Trançon as to Nippon Life's policy about recording communication among Board members. Trigano argues this would have established that there were no direct communications between Nippon Life and other Board members that might have contributed to Nippon Life's change of position. However, while Trançon was competent to testify about procedures in the <u>Paris</u> office as to such communications, Trigano did not establish that she knew enough about procedures in the <u>Tokyo</u> office to testify knowledgeably that any and all such contacts were relayed to her. Thus, Trançon's proffered testimony could not show what Trigano wanted it to,

namely, "that no communication [between Nippon Life and other Board members] took place."

Accordingly, none of the challenged evidentiary rulings provides a basis for reversal of the district court's decision.

Affirmed.