Frank William VONACHEN, Plaintiff,

v.

COMPUTER ASSOCIATES
INTERNATIONAL, INC.,
Defendant.

Civil Action No. 05–12054–JLT.

United States District Court,
D. Massachusetts.

Dec. 14, 2007.

Denzil D. McKenzie, McKenzie & Associates, P.C., Boston, MA, for Plaintiff.

David J. Santeusanio, Paul G. Lannon, Jr., Holland & Knight, LLP, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

TAURO, District Judge.

Plaintiff Frank Vonachen brings claims against Defendant Computer Associates, his former employer, alleging two violations of the Massachusetts Wage Act and a breach of the covenant of good faith and fair dealing. Presently at issue is Defendant's *Motion for Summary Judgment* [# 19] and Plaintiff's *Motion for Summary Judgment* [# 25]. After considering the submissions of the parties, and holding a hearing on November 20, 2007, Defendant's Motion is ALLOWED and Plaintiff's Motion is DENIED for the following reasons.

### Factual Background

Defendant Computer Associates ("CA") hired Plaintiff Frank Vonachen ("Vonachen") as an at-will sales executive in August of 2001.[1] CA sent to Vonachen for his review and acceptance two documents that would govern his compensation: CA's Incentive Compensation Plan ("Compensa-

---

1. Pl.'s Mem. of Law. in Supp. of Pl.'s Cross Mot. for Summ. J. at 2[# 27] ("Pl. Mem. in Supp."). There is no dispute that Vonachen was an at-will employee of CA. *See* Pl. Mem. of Law in Supp. of his Opp. to the Cross Mot. of Comp. Assoc., Inc. for Summ. J. 14[# 31] ("Pl.Opp."). CA is in the business of information technology management software.

tion Plan") and CA's Wealth Enabling Plan ("WEP").[2]

The Compensation Plan "sets out the general rules for the payment of commissions that are earned by all CA employees and contractors engaged in the sale of CA's products," and is published by CA annually.[3] The Compensation Plan in effect at the time contained numerous provisions granting CA significant discretion in adjusting compensation.[4]

The WEP sets out commission rates and sales quotas for employees, and is published by CA biannually.[5] The WEP in effect at the time set Vonachen's base salary at $85,000, and established a total sales quota for Vonachen of $7,000,000.[6] Vonachen accepted these plans by checking the "Accept" box on the electronic versions sent to him.[7]

Pursuant to those plans, Vonachen and other sales executives were paid commissions on any sales made by their respective sales teams. Vonachen was on the Fidelity sales team, along with two other sales executives and a sales manager—Brian Pallotta ("Pallotta").[8]

In December 2003, the Fidelity sales team booked a $35,000,000 order with Fidelity that had a initial "booking value" ("BV")—calculated using Generally Accepted Accounting Principles-of approximately $15,135,000.[9] To calculate the team's compensation on the sale, CA adjusted the booking value and resultant commissions.[10] In the process of doing so, CA management exchanged various email communications and documents regarding the level of adjustment.[11] CA notes, and these communications confirm, that CA management relied in part on the "Single Transaction Limit" clause in the Compensation Plan to adjust the booking values on the transaction. The clause is located in a section of the contract entitled "BV Policies and Adjustments," and reads as follows:

**2.4.2 Single Transaction Limit**
No Commissions shall be payable to an Exec[utive] in excess of 150% of such Exec[utive]'s annual quota if such Commission is the result of a Transaction (or

2. Pl. Mem. in Supp. at 3.

3. *Id.*

4. *See infra* Discussion (B)(1).

5. Pl. Mem. in Supp. at 3.

6. *Id.* at 4.

7. *Id.* at 3. The electronic version contained the language, "By clicking 'accept' below: I acknowledge receipt and acceptance of the Comp Plan and this WEP, and agree to adhere to the guidelines and other terms and conditions set forth in both documents, including without limit those in Chapter 1 of the Comp Plan regarding confidentiality." *See* Wealth Enabling Plan (Ex. 2 to Pl. Mem. in Supp.) [# 27–4]. The Compensation Plan also contained a provision that stated, "You agree that your electronic acceptance of the terms and conditions of this Plan shall have the equivalent legal effect of your having ac-

cepted this plan by executing a paper document." *See* Compensation Plan § 1.1.4(b) (Ex 1A to Pl. Mem. in Supp.) [# 27–2].

8. Pl. Mem. in Supp. at 3. Fidelity is a large financial services provider.

9. *Id.* at 4–5. The "booking value" is defined as the "present value of the Incremental Committed Contract Value for the specified term of a Transaction." *See* Compensation Plan § 1.2(a)(1).

10. *See* Mem. in Supp. of D.'s Mot. for Summ. J. at 3[# 20] ("D. Mem. in Supp."); Pl. Mem. in Supp. at 6–7 and exhibits cited therein.

11. *See* Pl. Mem. in Supp. at 6–7 and exhibits cited therein. Vonachen asserts that these communications "demonstrate a sinister scheme by CA to deprive its sales executives of their commission." *Id.* at 16. The court will address this below.

series of Transactions within a twelve month period) with a single Customer. Any exception to the foregoing limit must be approved in writing by the CFO and Executive Vice President of Sales.[12]

Eventually, CA applied the Single Transaction Limit to all members of the Fidelity team.[13] Utilizing the provision and the sales quotas, CA calculated the adjusted booking value for Vonachen and the two other executives to approximately $8,000,000.[14] CA then used the $8,000,000 figure to calculate commissions on the sale, which resulted in Vonachen receiving approximately $290,000, and the other two executives receiving about $282,000.[15] Without any adjustment to the booking value by CA, two of the executives, including Vonachen, would have received about $528,000 each, with the third executive receiving about $515,000.[16]

At a meeting during January 2004, George Fischer ("Fischer"), Senior Vice President and Area Manager of CA, informed the Fidelity sales team of the adjusted level of commission payments on the 2003 sale as a result of the adjusted booking values.[17] Fisher allegedly told the team that "two million dollars [in commissions for the entire team] was too much and caused him to wonder what his superiors would think about such high levels of commission."[18] In addition, Fischer told the team that "commissions are not considered a lottery."[19]

Vonachen allegedly asked Pallotta, the Fidelity team's sales manager, "for an explanation behind the decision to cap the commission."[20] Vonachen alleges that Pallotta responded, "You made a lot of money. You should be happy you have a job. Keep your mouth shut."[21] Pallotta denies that Vonachen complained to him about the decision and denies making these alleged comments.[22] For purposes of summary judgment, however, the court accepts (1) that Vonachen complained to Pallotta and (2) that Pallotta made these comments.

Subsequently, Computer Associates underwent a major reorganization of its sales department, including the creation of geographic sales territories and account director positions to service larger accounts.[23] Bernadette Nixon, CA's Regional Manager of New England, headed a team responsible for assigning sales executives to territories and appointing account directors.[24] As part of the reorganization, CA reassigned Vonachen from the Fidelity sales team to a geographic terri-

12. *See* Compensation Plan § 2.4.2 (spacing modified). "Quota" refers to a sales executive's target sales for a year.

13. *See* Ex. 7 to Pl. Mem. in Supp. [# 27–9].

14. *See id.*

15. *See id.*

16. *See* Fidelity Commissions (Ex. 5 to Pl. Mem. in Supp.) [# 27–7].

17. Pl. Mem. in Supp. at 7–8.

18. *Id.* at 8. For purposes of summary judgment, the court accepts that Fischer made these statements.

19. Fischer Dep. 120 (Ex. 23 to Pl. Mem. in Supp.) [# 27–26].

20. Pl. Mem. in Supp. at 8.

21. *Id.*

22. *See* Pallotta Decl. ¶ 7 (Ex. 5 to *D. Mot. for Summ. J.* [# 19] ).

23. *See* Fitzgerald Dep. 55–56 (Ex. I–1 to *D. Mot. for Summ. J.*) [# 23–15].

24. *See* Def. Mem. in Supp. at 4–5. At the Hearing, the Parties agreed that there was no dispute with respect to who made the assignment decisions.

tory—Northwestern Massachusetts.[25] Vonachen had asked to be considered for an Account Director position, but Nixon declined to offer him the position.[26] CA announced the new assignments in April of 2004, and on May 3, 2004, the day that the new territories went into effect, Plaintiff resigned to accept a job with Microsoft.[27]

Plaintiff advances three counts: (I) a violation of the Massachusetts Wage Act for failure to pay the commissions owed to him;[28] (II) a retaliation claim under the Massachusetts Wage Act for an alleged constructive discharge;[29] and (III) breach of the common law covenant of good faith and fair dealing for an alleged constructive discharge.[30] Plaintiff seeks a judgment awarding unpaid commissions, lost back pay, front pay, lost benefits and pre-judgment interest.

**Procedural Background**

On September 14, 2007, Defendant moved for Summary Judgment on Counts I, II and III.[31] On September 17, 2007, Plaintiff moved for Summary Judgment on Count I only.[32] The Parties subsequently filed oppositions to the respective motions. On November 20, 2007, this court held a

hearing and took the motions under advisement.

**Discussion**

**A. Legal Standard for Summary Judgment**

A court may grant summary judgment when the moving party has shown "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[33] The court must examine the facts in the light most favorable to the non-moving party, resolving any reasonable inference in that party's favor.[34] A court may enter summary judgment when a plaintiff fails to show sufficient evidence to establish an essential element of his case on which he bears the burden of proof at trial.[35] In addition, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to establish a genuine issue of fact for trial.[36]

**B. Count I. Wage Act Claim: Commissions from the 2003 Fidelity Transaction[37]**

■ There is no genuine issue of material fact as to Count I, because the rele-

25. *See id.* at 6.

26. *See id.* at 12. As noted by Defendant, however, "Vonachen's federal court complaint is devoid of any reference to the allegation that CA retaliated against him by not promoting him to an Account Director position." *See id.*

27. *See id.* at 5–6.

28. The Massachusetts Weekly Wage Act mandates prompt payment of wages to all employees, including commissions earned by sales professionals. *See* Mass. Gen. Laws ch. 149, § 148 (2006).

29. *See id.* at § 148A.

30. Complaint and Demand for Jury Trial ¶¶ 19–31[# 1].

31. *D.'s Mot. for Summ. J.* [# 19].

32. *Pl.'s Motion for Summary Judgment* [# 25].

33. Fed.R.Civ.P. 56(c).

34. *Dasey v. Anderson,* 304 F.3d 148, 153 (1st Cir.2002).

35. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

36. *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990).

37. Plaintiff originally brought an additional claim under the Wage Act for unpaid commission on a purported sale to Fidelity in February 2004. *See* Complaint and Demand for Jury Trial ¶ 16–17. At the Summary Judgment Hearing, Plaintiff withdrew this claim.

vant inquiry solely involves the terms of the Compensation Plan agreement. Consequently, this is a question of law for the court to resolve, and Vonachen's Wage Act claim for additional commissions fails as a matter of contract law.

### 1. CA's Discretion to Adjust Booking Values and Commissions

Numerous provisions in the Compensation Plan in effect at the time gave CA the express and broad discretion to adjust booking values on sales and commission payments to sales executives.

First, CA explicitly had significant discretion to adjust booking values, which were, in turn, used to calculate commissions. These provisions included the following:

- **Reductions to BV**

 In determining BV for purposes of Commissions payable under this Plan, CA reserves the right to consider all factors reflected in a given Transaction, and adjust BV accordingly.... [38]

- **"BV Adjustments"** will mean those adjustments made by CA in its *sole discretion* to Booking Value for any CA products, services, maintenance, or anything else discounted, forgiven, canceled or deferred in connection with a particular Transaction or a related series of Transactions.... [39]

Second, CA explicitly had broad discretion to adjust commission payments. These provisions included the following:

**No Commissions Payable Under Plan**

CA reserves the right to determine in its *sole and absolute discretion* wheth-er the requirements for payment of Commissions hereunder have been satisfied and its decision will be final and binding on all parties.... [40]

... CA has sole and *absolute discretion* in determining whether the business circumstances of any Transaction justify the payment of a commission advance hereunder.... [41]

Third, CA explicitly had wide-ranging discretion with respect to compensation in general. Such provisions included the following:

In the event of a conflict between the Plan and any other document, *or a question of interpretation arising therefrom*, decisions by CA Executive Management responsible for the applicable business organization concerning *the Plan or the interpretation of any of its terms and conditions*, including the *applicability of any term or condition to specific situations*, and the *award, payment, withdrawal and conditioning* of commission advances and *all other forms of compensation* or advance payment will be *final and binding on all affected parties.*[42]

The above provisions of the Compensation Plan are sufficient for CA to prevail as a matter of law. CA had considerable discretion with respect to the booking values and commissions on the 2003 Fidelity sale, and CA acted well within this discretion when it adjusted compensation on the transaction.

---

**38.** Compensation Plan § 2.4.1 (emphasis in original) (spacing modified).

**39.** *Id.* at § 1.2(a)(3) (emphasis in original).

**40.** *Id.* at § 1.3.3(e) (emphasis added) (spacing modified).

**41.** *Id.* at § 1.3.3(a) (emphasis added).

**42.** *Id.* at § 1.1.6(c) (emphasis added).

Additionally, however, another section of the Compensation Plan further supports CA's position.

## 2. The Single Transaction Limit

CA also retained explicit discretion to adjust booking values in certain cases involving large transactions with a single customer. As noted above, another section of the Compensation Plan read as follows:

### 2.4 B[ooking] V[alue] Policies and Adjustments

. . . .

### 2.4.2 Single Transaction Limit

No Commissions shall be payable to an Exec[utive] in excess of 150% of such Exec[utive]'s annual quota if such Commission is the result of a Transaction (or series of Transactions within a twelve month period) with a single Customer. Any exception to the foregoing limit must be approved in writing by the CFO and Executive Vice President of Sales.[43]

CA interpreted this clause to mean that if the booking value of a sale exceeds 150 percent of an executive's quota, the commissions are capped at the discretion of the management.[44] Accordingly, because (1) the 2003 Fidelity sale involved one customer, Fidelity, and (2) the booking value of the sale exceed 150 percent of Vonachen's sales quota, CA applied the Single Transaction Limit to Vonachen and his colleagues.[45] As a result, CA adjusted the booking value for the transaction and then calculated Vonachen's commissions based on the adjusted value.[46]

On the other hand, Vonachen interpreted the Single Transaction Limit to prevent the payment of commissions in excess of 150 percent of an executive's quota, not payments on transactions that have booking values that exceed 150 percent of an executive's quota.[47] This would have resulted in the Single Transaction Limit *not* applying to cap the commission on the 2003 Fidelity sale.[48]

Here, therefore, we have a question of contract interpretation: Does the 150 percent cap apply to cap booking values or to cap commissions? In these situations, a court typically addresses the relevant factors under the law of contracts with regard to which party's meaning should prevail.[49] This may or may not include extrinsic evidence of the type advanced in this case. As a threshold matter, however, the court need not address these factors because of one of the provisions referenced above.[50] Section 1.1.6(c) of the Compensation Plan reads:

In the event of a conflict between the Plan and any other document, *or a question of interpretation arising therefrom,* decisions by CA Executive Management responsible for the applicable business organization concerning *the Plan or the interpretation of any of its terms and conditions,* including the *applicability of any term or condition to specific situations,* and the *award, payment, withdrawal and conditioning* of commission

---

43. *Id.* at § 2.4.2 (spacing modified).

44. *See, e.g.,* D. Mem in Supp. at 3; D. Opp. to Pl. Mot. for Summ. J. 3[# 28] ("D.Opp.").

45. *See* D. Mem in Supp. at 3.

46. *See id.*

47. *See, e.g.,* Pl. Mem. in Supp. at 17.

48. *See, e.g., id.* at 5; Pl. Opp. at 14.

49. The Restatement (Second) of Contracts sets out the traditional approach for analyzing "whose meaning prevails?" *See* Restatement (Second) of Contracts § 201 (1981). *See also* 5–24 *Corbin on Contracts* § 24.5.

50. Vonachen does not address this provision in his submissions.

advances and *all other forms of compensation* or advance payment will be *final and binding on all affected parties.*[51]

Here, the "final and binding" clause applies. First, we have a question of interpretation arising from the Compensation Plan that concerns one of the plan's terms—the Single Transaction Limit. Second, the question of interpretation specifically involves the "applicability" of the Single Transaction Limit to a "specific situation"—the 2003 Fidelity sale. Lastly, the question of interpretation also involves the "award, payment, withdrawal and conditioning" of commissions, a "form[ ] of compensation." As a result, the clause applies, and CA's view that the Single Transaction Limit caps booking values, not commissions, is "final and binding" on Vonachen.

### 3. Conclusion as to Count I

As noted, the general discretionary provisions of the Compensation Plan suffice for CA to prevail as a matter of law, permitting CA to act within its discretion in adjusting compensation on the Fidelity transaction. In further support of CA's position, however, the Single Transaction Limit specifically gave CA the right to cap booking values on large transactions, and CA's interpretation of this provision controls based on the "final and binding" clause in the contract. Because Vonachen is not entitled to any additional commissions from CA as a matter of law, he has not made out a prima facie case under the Wage Act. Defendant is therefore entitled to summary judgment on this count.

### 4. Note on Management's Emails and Comments

Vonachen asserts that emails and documents generated by CA management during the booking value and commission adjustment process "demonstrate a sinister scheme by CA to deprive its sales executives of their commission."[52] In addition, Pallota told Vonachen to "keep his mouth shut" regarding the commissions, and Fischer said that the commissions were too high.[53]

These assertions and statements, however, are insufficient to create a triable issue of fact, and do not change the court's analysis with respect to Count I. First, CA management's communications regarding adjusting the booking values and commissions on the 2003 Fidelity sale fall squarely within the discretion granted to management in the Compensation Plan. Second, nothing in the communications raises a question regarding management's authority to adjust booking values and commissions. Lastly, and related to the previous point, the comments attributed to Fischer and Pallotta "are irrelevant to whether CA's management had contractual authority to adjust those commissions."[54]

### C. Count II: Wage Act Retaliation Claim and Count III: Breach of Covenant of Good Faith and Fair Dealing

 Plaintiff also asserts (1) a retaliation claim under the Massachusetts Wage Act; and (2) a claim for a breach of the covenant of good faith and fair dealing. Plaintiff is required to establish a con-

---

**51.** Compensation Plan § 1.1.6(c) (emphasis added).

**52.** Pl. Mem in Supp. at 16.

**53.** *Id.* at 8. As noted above, Pallota denies making these comments, but the court accepts that he made them for purposes of summary judgment.

**54.** D. Opp. at 4 n. 2.

structive discharge to succeed on both claims at trial.

### 1. Constructive Discharge is a Necessary Element of Counts II and III

#### i. The Massachusetts Wage Act ("Wage Act")

Plaintiff asserts a claim under the Wage Act, alleging that he was constructively discharged as retaliation for his complaints regarding commissions. The Wage Act prohibits an employer from penalizing an employee "in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter." [55]

#### ii. The Covenant of Good Faith and Fair Dealing

Vonachen also asserts that CA breached the covenant of good faith and fair dealing by taking "certain actions designed to force the plaintiff to quit his job;" and "constructively discharging the plaintiff in order to deprive him of commissions he had earned." [56]

■ To advance a claim for breach of the covenant, a Plaintiff must establish four elements: (1) status as an at-will employee; (2) *termination of employment*; (3) termination without "good cause" or in "bad faith"; and (4) termination with the purpose of depriving an employee of benefits to which he is entitled. [57]

For purposes of this analysis, the court focuses on the second element—whether employment was terminated. A question arises, however, with respect to whether an employer must actually terminate an employee or whether the termination may be constructive. CA argues that actual termination is required to establish a violation of the covenant, [58] while Vonachen argues that a constructive termination is sufficient. [59]

This court, however, declines to address this question, because it is unnecessary to the holding in this case. [60] Even accepting the proposition that constructive termination satisfies the termination requirement of the covenant, Vonachen fails to establish a constructive discharge as a matter of law.

### 2. No Constructive Discharge as a Matter of Law

#### i. Constructive Discharge Under Massachusetts Law

■ In the leading Massachusetts case on constructive discharge, the Supreme Judicial Court states, "A constructive discharge occurs when the employer's conduct effectively forces an employee to resign." [61] The Court continues, "Although the employee may say, 'I quit,' the employment relationship is actually severed invol-

---

55. Mass. Gen. Laws ch. 149, § 148A (2006).

56. Complaint and Demand for Jury Trial ¶¶ 28, 31.

57. *See Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 726 (1st Cir.1999) (discussing Massachusetts law); *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1125 (1st Cir.1995) (discussing Massachusetts law); *Gram v. Liberty Mut. Ins. Co.*, 391 Mass. 333, 461 N.E.2d 796, 799–800 (1984) (Gram II); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21, 29 (1981) (Gram I); *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1257 (1977).

58. *See, e.g.*, D. Mem. in Supp. at 19.

59. *See, e.g.*, Pl. Opp. 11–13.

60. As such, this question of state law is better left to the Massachusetts courts.

61. *GTE Prods. v. Stewart*, 421 Mass. 22, 653 N.E.2d 161, 168 (1995) (internal quotation marks omitted).

untarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." [62] An employee, however, must be reasonable, and has "an obligation not to assume the worst, and not to jump to conclusions too fast." [63]

The Massachusetts Appeals Court explains that constructive termination falls into two lines of cases: (1) "claims of intolerable working conditions" and (2) "demotions and other losses of authority or status in executive and managerial positions." [64]

### a. Intolerable Working Conditions

■ Under Massachusetts law, "in order for a constructive discharge to be found, the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." [65] "The test is met if, based on an *objective assessment* of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable." [66] Likewise, "the purpose of the constructive discharge doctrine is to protect employees from an employer's calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his coworkers." [67]

■ More specifically, "[M]ere dissatisfaction with the nature of assignments . . . and dissatisfaction with compensation have been held insufficient to establish a triable question of fact on the issue of constructive discharge." [68] In addition, a "limited blow to one's pride or prestige does not provide reason enough to resign during whatever period may be required to seek judicial or administrative relief. A more drastic reduction in the quality of working conditions is needed." [69]

### b. Demotions and Status Reductions

■ "If an employee, especially an executive employee, is engaged to fill a particu-

---

62. *Id.*

63. *GTE*, 653 N.E.2d at 169 (emphasis in original). *See also Rubin v. Household Commer. Fin. Servs.*, 51 Mass.App.Ct. 432, 746 N.E.2d 1018, 1029 (2001) (*citing GTE* 653 N.E.2d at 169).

64. *Rubin*, 746 N.E.2d at 1024–1025 (formally recognizing the separate line of cases for the first time).

65. *GTE*, 653 N.E.2d at 169 (internal quotations omitted).

66. *Id.* (emphasis in original). *See also Feliciano–Hill v. Principi*, 439 F.3d 18, 27 (1st Cir.2006) (discussing constructive discharge in federal law, and noting that this is "an objective standard that cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held.") (internal quotation marks and brackets omitted); *Trigano v. Bain & Co.*, 380 F.3d 22, 27–28 (1st Cir.2004) ("An apparently voluntary resignation, however, does not rise to the level of constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances.") (*citing GTE* ).

67. *Formato v. Protonex Techs. Corp.*, 2006 WL 4114292, at *7,2006 Mass.Super. LEXIS 659 at *18–19 (Mass.Super. Dec. 20, 2006) (*quoting Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559 (1st Cir.1986)) (internal citations and quotations omitted).

68. *GTE*, 653 N.E.2d at 169. *See also Jackson v. McKesson Health Solutions L.L.C.*, 2004 WL 2453000, at *9, 2004 U.S. Dist. LEXIS 21997 at *32 (D.Mass. Oct. 29, 2004) (*citing GTE* ).

69. *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119–120 (1st Cir.1977). *See also Vesprini v. Shaw Indus.*, 221 F.Supp.2d 44, 64 (D.Mass.2002) ("However, a blow to the employee's pride or prestige associated with a change in duties, standing alone, is insufficient to sustain a constructive discharge claim.").

lar position, any material reduction in rank constitutes a breach of the employment agreement and is tantamount to a discharge, unless the employment contract, by its terms, contemplates a change in the rank and nature of the job." [70] The Massachusetts Appellate Court notes, "most cases finding that an executive has been constructively discharged involve *express employment contracts,* and a material breach not contemplated by the agreement that is so important it makes continued performance 'virtually pointless.' " [71]

Under this line of cases, the Massachusetts Appellate Court also explained that courts have found constructive discharge in three situations. First, the courts have found constructive discharge "if the employer effectively gave the employee's job to someone else." [72] For example, in *Miller v. Winshall,* "Plaintiff was employed, *pursuant to a written agreement,* as president and chief executive officer of the corporation," and then "he was removed from this office at a board of directors meeting at which another person was elected president." [73]

Second, the courts have found constructive discharge when the employer "transferred the employee's responsibilities leaving him without any authority." [74] For example, in *Trapkus,* "the plaintiff was

employed *pursuant to an oral agreement,* as *vice-president* and executive employee of the corporation; ... he was not paid a salary during the month of August 1983; ... defendant corporation's president gave plaintiff a letter of written job instructions indicating plaintiff had lost all his independent authority and ordering him to begin menial labor tasks; ... [and] plaintiff was locked out of the corporate store." [75]

Lastly, the courts have found constructive discharge when the employer "reassigned the employee to a nonexistent job." [76] For example, in *Hayes,* plaintiff was employed pursuant to a written agreement that contemplated the plaintiff initially "serving as vice president of sales and marketing," but permitted a change to another position with "supervisory or managerial functions." [77] Defendant then transferred plaintiff to a managerial position that did not exist at the time, in a sales district that the company never established.[78] "The reassignment relieved him of his responsibilities as vice president, and instead of supervising four salesmen and working on pollution in the defendant's main office, he would be charged with establishing a new regional office some 3,000 miles away." [79] The court concluded, "Under similar circumstances courts have held that refusal to submit to

**70.** *Rubin v. Household Commer. Fin. Servs.,* 51 Mass.App.Ct. 432, 746 N.E.2d 1018, 1024 (2001) (citing *Miller v. Winshall,* 9 Mass.App. Ct. 312, 400 N.E.2d 1306, 1310 (Mass.1980)).

**71.** *Id.* at 1028 (citing 2 Rothstein, *Employment Law* § 8.7, at 257 (2d ed.1999)) (internal citations and quotations omitted) (emphasis added).

**72.** *Id.* (citing, inter alia, *Miller,* 400 N.E.2d at 1310).

**73.** *Miller,* 400 N.E.2d at 1310.

**74.** *Rubin,* 746 N.E.2d at 1028 (citing, inter alia, *Trapkus v. Edstrom's, Inc.,* 140 Ill.App.3d

720, 95 Ill.Dec. 119, 489 N.E.2d 340, 344 (1986)).

**75.** *Trapkus,* 95 Ill.Dec. 119, 489 N.E.2d at 344.

**76.** *Rubin,* 746 N.E.2d at 1028 (citing *Hayes v. Resource Control, Inc.,* 170 Conn. 102, 365 A.2d 399, 400 (1975)).

**77.** *Hayes,* 365 A.2d at 400.

**78.** *See id.*

**79.** *Id.*

such reassignments did not justify discharge by the employer, especially where, as here, the plaintiff's contract expressly forbade demotion below a managerial or supervisory position." [80]

### ii. Vonachen's Evidence

Vonachen's evidence of retaliation involves mixed claims of intolerable working conditions and status reductions. Vonachen claims to have resigned due to Defendant's conduct, because he felt "threatened," and "felt like [he] was being thrown out—forced out." [81] In his deposition, Vonachen provides four examples of actions that were allegedly designed to force him to quit his job: (1) CA did not pay the full commissions on the 2003 Fidelity sale; (2) CA reassigned him to a geographic sales territory; (3) Pallotta started ignoring him after he complained about the commissions; and (4) Nixon—the person responsible for reassigning the sales executives—treated him coldly when he interviewed with her during the reorganization process and did not respond to his requests for a follow-up meeting.[82]

Vonachen asserts that his reassignment to a geographic territory was a material change in his duties and a significant reduction in rank.[83] Here, according to Vonachen, before the reorganization, he was a member of an "elite group of CA sales executives who sold only to the then largest accounts of the company regardless of territory." [84] After the reorganization, Vo-

nachen was "essentially asked to start fresh in spite of his experience inside and outside of CA." [85]

### iii. Vonachen's Evidence is Insufficient as a Matter of Law

Vonachen has the burden of proof on this issue, and Vonachen's evidence of retaliation is insufficient as a matter of law, under both lines of cases, to establish a prima facie case of constructive discharge.

#### a. No Unpaid Commissions

As noted above, CA does not owe Vonachen any unpaid commissions, so this fails as a possible ground for constructive termination.

#### b. Geographic Territory Assignment

Vonachen's reassignment to a geographic territory does not create a triable question of fact under either line of constructive discharge cases.[86] Under the intolerable conditions line of cases, although Vonachen may have been unhappy with his new assignment, mere dissatisfaction with the nature of assignments is insufficient to establish a constructive discharge. In addition, notwithstanding Vonachen's belief that the position was inferior, a constructive termination "cannot be triggered solely by" Vonachen's "subjective beliefs" nor by a mere reduction in alleged prestige of the sales position. Moreover, as noted by CA, "Experienced sales executives like Vonachen are expected to know

---

80. *Id.*

81. Pl. Opp. at 10 (*citing* Vonachen Dep. I 69).

82. *See* Pl. Opp. at 15–16. As noted above, Vonachen does not allege in his complaint that CA retaliated against him by not making him an Account Director. Vonachen also does not address the Account Director position in his memoranda. Accordingly, the court does not consider the lack of promotion as evidence of retaliation.

83. *See id.* at 10.

84. *Id.* at 10–11.

85. *Id.* at 11.

86. Although the court attempts to separate the analyses, the intolerable conditions analysis is relevant to the demotions and status reduction analysis, and vice versa, and should be considered as such.

how to adjust to a new sales environment."[87] Placing Vonachen in a new sales environment and asking him to sell the company's products simply does not, as a matter of law, constitute "unreasonably harsh conditions."

The reassignment claim also fails as a matter of law under the demotion and status reduction line of cases. First, unlike most of the demotions and status reduction cases, Vonachen was not hired pursuant to a contract. There is no dispute that Vonachen was an at-will employee of CA, and that no contract guaranteed Vonachen continued employment or a certain level of position, e.g., a managerial role.[88]

Second, the majority of the demotion and status reduction cases involve executives, such as vice presidents, CEOs and other senior officers. Although Vonachen was hired as a "sales executive," this was not an executive position in the true meaning of the word. Indeed, Black's defines "executive employee" as one "whose duties include some form of managerial authority and active participation in the control, supervision, and management of the business."[89] Here, Vonachen was not a sales manager, vice president or any other senior-level official.[90] Additionally, there is no indication that Vonachen actively participated in the control, supervision or management of CA's business.

Third, unlike in *Miller*, CA did not remove a contracted executive officer from a specific position, e.g., CEO, and replace him with another executive officer. In-stead, as part of a company-wide reorganization, Vonachen was an at-will employee who was reassigned to a different sales position.

Fourth, unlike in *Trapkus*, CA did not transfer Vonachen's responsibilities and leave him without authority. Vonachen was hired as a sales executive, and CA transferred him to another sales executive position. His authority remained the same. Moreover, also unlike in *Trapkus*, Vonachen does not allege that CA required him to do anything outside the job requirements of a sales executive, e.g., menial labor. CA asked Vonachen, as a sales executive, to sell the company's products in a different sales environment.

Fifth, CA did not reassign Vonachen to a non-existent job. The geographic territories were newly created, but they certainly existed by the time Vonachen was to start his new job. Additionally, unlike in *Hayes*, there was no reduction in seniority level; Vonachen remained a sales executive. Also unlike in *Hayes*, there was no reduction in supervisory authority, because Vonachen did not supervise anyone before the reassignment.[91] Lastly, also unlike in *Hayes*, CA did not send Vonachen an unreasonable distance to work in the new region. CA assigned Vonachen to a geographic territory in close proximity to the region in which Vonachen had already been working.

### c. Behavior by Managers

In his deposition, Vonachen states that Pallota started ignoring him after he com-

---

87. D. Mem in Supp. at 16.

88. Indeed, Plaintiff notes, "There is no question that Plaintiff was an 'at-will' employee. The Incentive Compensation Plan specifically states such." *See* Pl. Op. at 14.

89. *Black's Law Dictionary* 591 (7th ed.1999).

90. Indeed, a number of other individuals referenced in the record held traditional executive and managerial positions, e.g., Pallotta as Sales Manager; Fischer as Senior Vice President and Area Manager; and Nixon as Regional Manager of New England.

91. (With the possible exception of any support staff.).

plained about the commissions, and that Nixon treated him coldly. Even assuming, however, that Pallotta ignored Vonachen at times or that Nixon treated Vonachen somewhat indifferently, this fails to constitute, as a matter of law, conditions that were so "intolerable," "difficult or unpleasant," that a reasonable person would have felt compelled to resign.

### d. Note on the Timing of Departure

Lastly, Vonachen resigned the first day his new assignment took effect. Consequently, Vonachen did not spend any time in the new sales territory. Vonachen may have been able to learn a small amount about his new position before departing, but leaving without working a day in the new territory constitutes "jump[ing] to conclusions too fast." Instead of testing the new position for even a limited period of time, Vonachen resigned. The fact that Vonachen left to accept a position at Microsoft does not change the analysis. It may be the case that accepting a position at Microsoft was a good opportunity for Vonachen to pursue, independent of any alleged conditions at CA, but the relevant inquiry here involves only the environment at CA.

### iv. Conclusion as to Counts II and III

Accordingly, Vonachen fails to present sufficient proof of constructive termination as a matter of law. Because constructive termination is a required element of (1) the Wage Act retaliation claim and (2) the breach of the covenant good faith and fair dealing claim, Vonachen has not made out a prima facie case under either claim.[92] Defendant, therefore, is entitled to summary judgment on both counts.

92. As such, the court declines to address the other elements of these counts because they

### Conclusion

For reasons stated above, Defendant's *Motion for Summary Judgment* [# 19] is ALLOWED as to all counts of Plaintiff's Complaint, and Plaintiff's *Motion for Summary Judgment* [# 25] is DENIED.

IT IS SO ORDERED.

are unnecessary to the holding in this case.